**COMPANIA DE NAVEGACION CEBACO, S. A. v. THE STEEL FLYER et al.**

No. 3365.

United States District Court
D. Maryland.

Dec. 5, 1951.

Robert H. Williams, Jr., of Baltimore, Md., and, Dow & Symmers, of New York City (Wilbur E. Dow, Jr. and Frederick Fish, New York City,) for libellant.

William A. Grimes and Randall C. Coleman, Jr. (Ober, Grimes & Stinson), of Baltimore, Md., for claimant.

WILLIAM C. COLEMAN, Chief Judge.

This case involves a collision in Chesapeake Bay between the Steamship Domina, a Panamanian cargo vessel of 5531 gross tons, 426 feet long, and the Steamship Steel Flyer, a cargo vessel of the standard C-3 type, of 8018 gross tons and 492 feet in length, owned and operated by the Isthmian Steamship Company.

The Domina was proceeding up the bay to Baltimore in the early morning of March 28, 1951, with a bulk cargo of iron ore. The Steel Flyer was proceeding from Baltimore down the bay, bound for Norfolk, Virginia, partly loaded with general cargo. The night was dark but clear, with good visibility of from eight to ten miles, with a light south-west wind. Each vessel was in charge of a licensed Chesapeake Bay pilot. There is a conflict in the testimony as to the precise point of collision, but the weight of the credible evidence indicates that the two vessels came together about one-half mile to the east of Sandy Point light, which is about one mile north of the area designated as the construction area for the Chesapeake Bay bridge, this area extending about a mile north and south and about three miles east and west, with entrances to two channels through it, clearly charted and marked by buoys, and with a chart warning that within this area "are numerous lights, buoys and piles" used in the bridge construction.

The pilots of both the Domina and the Steel Flyer testified at the hearing, but the testimony of other persons aboard both vessels was taken entirely by deposition, which included, as respects the Domina, the testimony of her master, helmsman, second mate and chief engineer; and, as respects the Steel Flyer, the testimony of her master, helmsman, third officer, who was watch officer on the bridge at the time of the collision, third assistant engineer, and the bow watch. However, little testimony that is of much value is to be found in these depositions. The Court has seen and heard the pilot of each of the vessels. Since they were in complete charge of the vessels' navigation throughout the period involved in the collision, the responsibility for faulty navigation, if any, rests squarely upon them. Therefore, their testimony as to what they claimed to have seen and done is of primary importance. No testimony is found in the depositions or in the evidence submitted at the hearing sufficient to warrant our not accepting as substantially true what both pilots said, only, however, insofar as the signals which they gave and the maneuvers which they made of their respective vessels, are concerned. We cannot attach much importance to the testimony of Pilot Drennen, of the Palmara, which was following a half-mile to a mile astern of the Domina at about the time of the collision, because he said that he did not hear any whistles (which may be true, because he was to windward and he did not, in fact, see the collision). With this necessary approach to the case, we are satisfied that both pilots have shown themselves guilty of faulty navigation which directly contributed to the collision, and that there is no such disparity between the negligence of the two as to warrant exonerating one vessel as against the other if there is proper application of the major and minor fault rule.

Pilot Holland, in charge of the Domina, testified that upon entering the bridge construction area at a speed of about 8 or 8½ knots per hour, he saw the Steel Flyer about 5¼ miles away, showing only a green light and her two white range lights. He testified that at about this time he hauled to starboard some 8 degrees and blew one blast. The time was 2:18 a. m. He testified that, even with the two vessels still far apart, he was concerned with just what course the Steel Flyer was taking or intended to take. After blowing one blast he held his same course and speed. The one blast was not answered, and at 2:21 he blew one blast a second time, which likewise remained unanswered. He testified that the distance between the two vessels had closed to approximately a half to

three-quarters of a mile at this time (which was obviously incorrect or the clock readings he gave were wrong, because the two vessels could not have moved towards each other as fast as his computations indicated), and that he considered there was real danger of collision; that two minutes after blowing the second one blast and when, as he estimated, the vessels were not more than three-fifths of a mile apart, he blew three blasts and gave the order for full speed astern. At this time the Domina was still going ahead at the rate of about seven knots; and her pilot further testified that it would have required possibly five minutes before the Domina could have completely lost head-way. It was at 2:23 when he gave the order for full speed astern, and the collision happened a minute later, namely, at 2:24. The pilot testified that just before he gave the three blasts he heard three blasts from the Steel Flyer, and that when the two vessels came together the Domina was still moving ahead at about four to five knots. He testified that the other vessel was apparently crossing his course; that therefore he felt the rules required him to hold his course and speed; and that he never gave the danger signal for the reason that he did not see that it would have done any good.

It thus appears from the foregoing that the pilot of the Domina changed neither his course nor speed from the time when he blew his first one-blast, which was six minutes before the collision, until one minute before the collision, when he went full speed astern, in spite of the fact that he admitted that when he first blew a one blast he had been concerned as to just what was the intention of the Steel Flyer, and in spite of the fact that he could not see that she had either changed her speed or course.

▮▮▮▮ It seems clear on the aforegoing testimony of Pilot Holland that he was guilty of negligent navigation of the Domina, because, even though the Domina was the privileged vessel, she had no absolute right to hold her course and speed regardless of the danger involved in so doing, which Pilot Holland admittedly recognized. The Domina's right to maintain her privileged position ended when danger of collision was reasonably apparent. Postal S. S. Corp. v. El Isleo, 308 U.S. 378, 60 S.Ct. 332, 84 L.Ed. 335. After the pilot of the Domina had received no answer to his second one-blast, if not indeed after he had received no answer to his first one-blast, he should have blown the danger signal; that is to say, he should have insisted upon a reply in order that there might be mutuality of understanding as to the courses of the two vessels. This he failed to do. Also, while great stress is laid upon the fact that Pilot Holland put his vessel full speed astern one minute before the collision, it is to be noted that he admitted he did not do this until he had heard three blasts from the Steel Flyer indicating that she was going full speed astern. Article 27 of the Inland Rules, 33 U.S.C.A. § 212, provides that "In obeying and construing these rules (the Inland Rules) due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger." It is apparent that there were special circumstances facing Pilot Holland which required him not to adhere blindly to the right given him under Articles 19 and 21, 33 U.S.C.A. §§ 204, 206, but to adopt promptly special precautions. It is no answer to say that it seemed apparent to him that sounding the danger signal or changing his course and speed would not have affected the situation. A pilot or master may not speculate in this manner. To do so is to cast sound discretion aside.

Turning to the testimony of the pilot of the Steel Flyer, the Court cannot refrain from saying that this person's testimony gave indication of his incompetency for his position, in spite of the fact, as he testified, he had had some 17 years experience as a coast pilot. Much of his testimony was so evasive of the precise issues presented and so clearly indicated either incompetency or indifference to the importance of his position, or both, that we believe it is not necessary to analyze it in other than its major details.

The Steel Flyer was proceeding down the bay at a speed of about 13 knots when Pilot Stevens, as he testified, saw a steady

red and a white light to the north of the lights in the bridge construction area; that he took these lights, however, to be on a stationery vessel moored in connection with the work on the new bridge; that he heard one blast, but he thought that this came from a vessel that was trailing the Domina, which turned out to be the tanker Palmara; that he answered this one blast and gave the order of "easy right" and a reduction of speed to one-half as "a precautionary measure" because of the proximity of the bridge construction area. He admitted that he had been confused and uncertain as to precisely what the red and white lights represented, and yet, as he testified, he realized that within a quarter of a minute of the time when he sounded his one blast, his vessel was in great danger of a head-on collision, because at that time he saw both the green and the red lights of the approaching vessel which he estimated was not more than a half-mile away. Thereupon he gave two blasts and simultaneously the order for hard left, then after a few seconds he gave an order for hard right and full speed ahead. The log of the Steel Flyer shows that only one minute elapsed between her having blown her first one blast and the moment of collision. He testified that he never blew three blasts and never went astern or stopped his engines. He admitted that he probably should have blown the danger signal but denied that he should have gone astern, because, he claimed, this might have resulted in a head-on collision, whereas he seemed to exult in the fact that a collision was *almost* avoided as a result of what he did; that is to say, it appeared that the Steel Flyer almost scraped by the Domina, as evidenced by the fact that the Domina's starboard side a little aft of the bow struck the Steel Flyer's starboard side only about 50 feet from her stern.

The aforegoing testimony makes the conclusion inescapable that Pilot Stevens was guilty of gross negligence. He admitted that he saw the lights on the Domina when she was several miles away; he further admitted that he was confused as to just what these lights represented, but, nevertheless, and in spite of the fact that he was under obligation to resolve this doubt, he admitted he did nothing whatsoever on his own account until he heard one blast, and that, even then, he replied with one blast not because he thought it came from the Domina, but from the vessel astern of her; and thereafter he persisted in taking no further precautions, and in fact apparently paid no attention to the on-coming Domina until she was bearing down upon him and he saw both of her running lights, whereupon he gave two blasts, ordered hard left then hard right,—a zig-zag course,—and then full speed ahead.

■ It is self-evident from these maneuvers that this pilot's confusion became worse confounded, due to his own failure to take the required precautions against the risk of collision beginning at the first moment when he entertained an uncertainty as to the lights which he saw ahead of him, and which, had he observed them with any reasonable degree of care and steadiness, he must have seen were not fixed but moving towards him, and therefore *could not have been on a moored vessel.* He should then have slackened his speed, or even stopped, and gone astern, and he should have sounded a danger signal and endeavored to come to a definite understanding as to a safe course on which both his own and the on-coming vessel might proceed, by the exchange of proper signals.

■ From the aforegoing summary of Pilot Steven's testimony it is obvious that his negligence was far greater than that of Pilot Holland. However, since, as we have explained, we believe that the latter's negligence was nevertheless of a serious character and *directly contributed to the collision,* we believe this is a situation in which, upon proper application of the major and minor fault rule, both vessels must be held to be at fault, and damages must be divided. The Cyrene, 4 Cir., 85 F.2d 935.

A decree will be signed in accordance with this opinion.