**COMPANIA DE NAVEGACION CEBACO, S. A. v. THE STEEL FLYER et al.**

No. 6431.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 11, 1952.

Decided Dec. 23, 1952.

Wilbur E. Dow, Jr., New York City (Robert H. Williams, Jr., Baltimore, Md., and Frederick Fish, New York City, on the brief), for appellant and cross-appellee.

William A. Grimes, Baltimore, Md. (Ober, Grimes & Stinson and Randall C. Coleman, Jr., Baltimore, Md., on the brief), for appellees and cross-appellants.

Before PARKER, Chief Judge, SOPER, Circuit Judge, and BARKSDALE, District Judge.

SOPER, Circuit Judge.

The collision which gave rise to this case took place between the S./S. Domina and the S./S. Steel Flyer in the early morning of March 28, 1951 in the Chesapeake Bay. The Domina is a steel coal burning cargo vessel of 5,531 tons, 426 feet in length, which was built in 1925. At the time of the collision she was proceeding northwardly to Baltimore heavily

3. See United States v. Petrillo, 332 U.S. 1, 6, 10, 67 S.Ct. 1538, 91 L.Ed. 1877.

loaded with iron ore. The Steel Flyer is a modern oil burning, easily handled cargo ship of 8,018 tons, 493 feet in length. At the time of the collision she was partly loaded with a general cargo and was on her way southwardly down the bay from Baltimore to Norfolk.

Each vessel was in charge of a licensed Chesapeake Bay pilot. The collision took place about 2:24 a. m. on a dark clear night with good visibility from eight to ten miles and a light southwesterly wind. The vessels came together about one-half mile east of Sandy Point Light and about one mile north of the construction area of the Chesapeake Bay Bridge then in course of erection. That area extended about a mile north and south and about three miles east and west with a dredged channel clearly marked and buoyed 1,100 feet in width through which the Domina had just passed and the Steel Flyer was about to enter.

When the Domina entered the dredged passage between buoys 1W and 2W marking the southern entrance, her pilot reduced her speed to half, estimated to be six and a half knots, and maintained her course of north 22 degrees east. At that time he observed the ship which turned out to be the Steel Flyer about five and a quarter miles to the north bearing two points to port and showing her green light and range lights. The Steel Flyer in her progress towards the bridge area would be expected to change her course to starboard, when she arrived off Sandy Point, in order to head for and enter the channel through which the Domina was about to pass.

After the Domina had traversed the channel and arrived at its north end between buoys 3W and 4W, she altered her course 8 degrees to starboard so as to give abundant clearance to the entrance to the channel to the ship coming from the north. The vessels were then on crossing courses so that under Article 19 and Article 21 of the U. S. Inland Rules, 33 U.S.C.A. §§ 204, 206, it was the duty of the Steel Flyer to keep out of the way of the other ship, and it was the duty of the Domina to keep her course and speed. The Domina, having the right of way, blew one whistle to signify her intention to hold her course and speed

as provided by the U. S. Inspectors' Rules for Inland Waters, Title 33, Ch. I, Part 80 C.F.R. The pilot gave this signal as a precautionary measure as he naturally expected the vessels to meet off the Sandy Point Light. He also crossed the bridge and inspected his red light because he "did not like the way the other ship was approaching." The running lights and the range lights of the Domina were all burning at that time. The Steel Flyer made no response to the Domina's signal.

According to the testimony of the Steel Flyer, she was making twelve and a half to thirteen knots. She observed the Domina's lights ten or twelve minutes prior to the collision when the vessels were over three miles apart. The lookout on the Steel Flyer recognized the lights of the Domina as a vessel under way and so reported, but the pilot of the Steel Flyer took the lights to be those of a stationary vessel moored in connection with the bridge construction, and attributed the Domina's signal to a vessel that was trailing the Domina up the bay. He reduced the speed of his vessel to one-half because of the proximity of the bridge and continued on his course. There was also evidence on behalf of the Steel Flyer that the after range light of the Domina was not burning and on this account the navigators of the Steel Flyer were misled; and this is the reason and the only reason offered in defense of the dangerous action of the Steel Flyer in proceeding upon her course and failing to go to starboard. The evidence, however, was clear that the lights of the Domina were all in good order and that the navigators of the Steel Flyer were confused, uncertain and in disobedience of the rules of navigation. The conclusion of the District Judge that the Steel Flyer was guilty of gross negligence in maintaining her course up to the moment of the collision was abundantly justified. See D.C., 104 F.Supp. 829.

The only substantial question in the case relates to the additional finding of the District Judge that the Domina was also negligent and that therefore the damages should be divided. That conclusion rests on the interpretation to be placed on the testimony of the Domina which is not se-

riously disputed. After blowing the one blast as aforesaid the Domina held her course and speed because the pilot considered that this was his duty under the rules of navigation. Two or three minutes thereafter, when the vessels were one-half to three-quarters of a mile apart, the Domina blew a second one blast and continued to hold her course and speed. There was then plenty of room and ample time for the Steel Flyer to have changed her course to starboard and keep out of the way; and such a change was to be expected because it would have headed her on the proper course to enter the passage way in the bridge area. She made no change of course or speed, however, and made no response to the second one blast from the Domina.

Shortly thereafter, at about 2:23 a. m., the Domina heard a three blast whistle from the Steel Flyer to which she responded in like manner. Both vessels backed, but since the Steel Flyer continued on her course and attempted to cross the bow of the Domina, a collision occurred one minute later when the bow of the Domina came into contact with the starboard quarter of the Steel Flyer.

The District Judge was of the opinion that the pilot of the Domina was at fault (1) because he held his course and speed regardless of the danger involved in so doing, and (2) because he failed to blow a danger signal which he should have given "after he had received no answer to his second one blast, if not indeed after he had received no answer to his first one blast; that is to say, he should have insisted upon a reply in order that there might be mutuality of understanding as to the courses of the two vessels." This decision seemingly rests on the view expressed during the trial below that when two vessels are approaching one another, the rules of the road require that the steamer taking the initiative should ask for and get confirmation of its course, and if it does not get confirmation, it should alter its position and stop and go astern. There is support for this interpretation of the rules applicable to a situation when steam vessels are approaching each other head and head, that

is end on, or nearly so, because Article 18, Rule 1, 33 U.S.C.A. § 203, provides that in such case it is the duty of each vessel to pass on the port side of the other, and either vessel shall give as a signal of her intention one short blast of the whistle which the other vessel shall answer promptly by a similar blast of the whistle and thereupon the vessels shall pass on the port side of each other; but if the situation of the vessels indicates a starboard passing, either vessel shall give two short blasts which the other vessel shall answer and they shall pass on the starboard side of each other.

■ In such case, there is provision for mutuality of understanding; but in this case the vessels were not meeting head on or nearly so, but were on crossing courses and therefore Articles 19 and 21, to which reference has been made above, were applicable. These rules make no provision for the giving and acceptance of signals since they clearly provide that the vessel which has the other on her starboard side shall keep out of the way of the other while the other shall keep her course and speed. The obligation of the Domina under the circumstances was definite and precise, and if she had departed therefrom and a collision had occurred, she would have had great difficulty in exculpating herself since it has been long established that when a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, the burden rests upon her of showing, not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. The Pennsylvania, 19 Wall. 125, 136, 22 L.Ed. 148.

In common with the decisions of the Supreme Court and of other circuits, we have enforced this rule with great consistency since it is of prime importance that when vessels are in dangerous proximity to one another, each shall be able to forecast the movements of the other. See Pacific-Atlantic S. S. Co. v. U. S., 4 Cir., 175 F.2d 632, 639. Thus it was said in Belden v. Chase, 150 U.S. 674, 699, 14 S.Ct. 264, 37 L.Ed. 1218, that the necessity must be clear

and the emergency sudden and alarming before an act of disobedience to a rule can be excused.

■ It is of course true that no vessel has a right of way into a collision, and Articles 27 and 29 of the Inland Rules, 33 U.S.C.A. §§ 212, 221, expressly provide that in obeying the rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which render a departure therefrom necessary to avoid immediate danger, and nothing in the rules will exonerate any vessel for the neglect of any precaution which may be required by the special circumstances of the case. These rules also have been applied consistently by this and other courts of admiralty in this country. See The New York, 175 U.S. 187, 20 S.Ct. 67, 44 L.Ed. 126; Postal S. S. Corp. v. El Isleo, 308 U.S. 378, 387, 60 S.Ct. 332, 84 L.Ed. 335; The Louise, 4 Cir., 52 F. 885; City of Chester, 4 Cir., 78 F. 186; The Tenadores, 2 Cir., 298 F. 740.

■ The undisputed facts, as found by the District Judge, however, do not indicate that the pilot of the Domina had reason to believe that the Steel Flyer would so completely disregard her plain duty as to require the Domina to change her course and speed, until the Steel Flyer gave the three blasts on her whistle and it was too late to avoid the catastrophe which the Steel Flyer had precipitated. The situation which confronted the navigators did not involve the movement of vessels in a narrow channel or in a restricted area, but in wide open spaces with ample room for maneuver; and there were no other craft in the neighborhood to interfere with the movements of either ship. Furthermore, there was good reason for the belief of the Domina's pilot that the Steel Flyer would take the normal course to starboard in order to pass through the bridge construction area, which it was in fact necessary for her to do in order to pursue her course to Norfolk; and there was no reason for any navigator to anticipate and allow for the gross errors which the Steel Flyer admittedly committed in proceeding as if the Domina was not in her neighborhood. If there were doubt in the matter

the Domina might well be relieved under the decisions that hold that when one of two vessels is so grossly at fault as to account for an accident, doubt as to the propriety of the navigation of the other vessel should be resolved in her favor. The City of New York, 147 U.S. 72, 85, 13 S.Ct. 211, 37 L.Ed. 84; Tucker v. The Socony No. 9, 2 Cir., 167 F.2d 685.

The facts strongly resemble the collision between The Delaware and The Talisman, which was considered by the court in The Delaware, 161 U.S. 459, 16 S.Ct. 516, 40 L.Ed. 771, both in regard to the position of the vessels and the signals by the privileged vessel which were ignored by the other. In that case the vessels were in a crossing situation; and the Talisman, which was the privileged vessel, was under the duty to hold her course and speed, while the Delaware, which in ordinary course would have swung to her right to enter a channel to reach the harbor of New York, was the burdened vessel and obligated to keep out of the way. The Talisman blew one blast when the vessels were a mile apart and another when they were one-quarter of a mile or less apart, but neither signal was answered. When they were a ship's length apart, the Talisman blew a three blast whistle but the Delaware, instead of slowing down or going to starboard, kept on and the collision occurred. The Delaware was held to be solely in fault. The Talisman was charged with violation of the rules in not directing her course to starboard after sounding her first signal, but the court said, 161 U.S. at pages 466-467, 16 S.Ct. at page 520,

"* * * These rules, however, so far as they require the whistle to be used, are applicable rather to vessels meeting end on or nearly end on, and the signals therein provided for are designed to apprise the approaching vessel of the intention of the steamer giving the signal to port or starboard, as the case may be. As applied to vessels upon crossing courses, however, it means, when a single blast is given by the preferred steamer, nothing more than that she intends to comply with her legal obligation to keep her course,

and throw upon the other steamer the duty of avoiding her."

The main fault charged against the Talisman was of not stopping and reversing when the Delaware failed to take measures to avoid her; but the court held that it was the primary duty of a steamer having the right of way when approached by another to keep her course and that this rule applies so long as there is nothing to indicate that the approaching steamer will not discharge her own obligation, that is, so long as it is possible for the other vessel to avoid her, at least in the absence of some distinct indication that she is about to fail in her duty. In applying these rules in the case before them the court said, 161 U.S. at page 469, 16 S.Ct. at page 521:

"In the case under consideration there was really nothing to apprise the tug that the Delaware would not port and go under her stern, until the collision became inevitable. The vessels were in plain sight of each other. The Delaware was entering a channel, whose course was marked by buoys, and she could not possibly have continued her then course without soon crossing the line of black buoys, which marked the southerly edge of the channel. There was every reason to suppose that, as soon as she passed the line of red buoys at the northerly edge, she would port, and take her proper course up the channel; and if for any reason she was unable to do this, it was her plain duty to apprise the tug of the fact either, by blowing the starboard signal of two whistles or an alarm whistle, to indicate that the circumstances were such as to render it impossible for her to fulfill her obligation to keep out of the way of the tug. If she had done so, a different question would have been presented. Until the last moment the tug had a right to assume that she would comply with the rule. Had the tug stopped and reversed, she might not only have brought about a collision with the Delaware, but would have incurred the danger of a collision with her own tow. It is true, the Delaware did not answer the signals of the Talisman as she should have done, but Capt. Winnett, who was in charge, testifies that he was under the impression that she answered the first whistle, and made an allegation to that effect in his libel. He appears to have been mistaken in this, but, as the morning was somewhat thick, he might have thought so, and was not in fault for acting upon that hypothesis. The second whistle was given so late that the vessels were evidently *in extremis* before a reasonable time had elapsed in which to answer it. In any event, there is too much doubt about the fault of the Talisman to justify us in apportioning the damages."

It was held, however, by the District Judge in the pending case that the pilot of the Domina was in error in failing to blow the danger signal when he got no answer to his second single blast at the time that the vessels were still one-half to three-quarters of a mile apart; and it is strongly urged that this omission was in violation of Article 18, Rule III, 33 U.S.C.A. § 203, that when steam vessels are approaching each other, if either vessel fails to understand the course or intention of the other, the vessel in doubt shall immediately signify the same by giving several short blasts, not less than four, of the steam whistle.[1] It is contended that the Domina's pilot was in doubt as to the proper action to take, because he testified in chief that when he was emerging from the bridge channel he took the precaution to blow his whistle and take a look at his red light because he did not like the way the Steel Flyer was approaching; and that his doubt was further shown by his testimony on cross examination when his attention was called to the

1. "Rule III. If, when steam vessels are approaching each other, either vessel fails to understand the course or intention of the other, from any cause, the vessel so in doubt shall immediately signify the same by giving several short and rapid blasts, not less than four, of the steam whistle."

signals above described and the maintenance by each vessel of her course and speed, and he was asked at the end of the questioning whether these circumstances made him at all curious about the navigation of the Steel Flyer and he replied, "I was wondering a bit."

In our judgment these answers by the pilot indicated the necessary interest and concern which every experienced and cautious navigator must feel when the ship in his charge is approached by another, rather than a doubt that the Steel Flyer would obey the rules of the road. When the testimony just quoted is considered with other answers which the pilot gave during his examination and cross examination by the attorneys for the opposing sides, it becomes clear that he regarded it as his duty to hold his course and speed because he believed that the Steel Flyer would not only get out of the way, since it was her duty to do so under the rules, but because it was to her interest to go to starboard in order to facilitate her entrance into the bridge channel.

The judgment will be affirmed in respect to the liability of the Steel Flyer but reversed as to the liability of the Domina and the case will be remanded for further proceedings.

Modified and remanded.