Petition of **VAL MARINE CORPORA-TION**, as owner of THE tug VAL NO. 1, for exoneration from or limitation of liability.

United States District Court
S. D. New York.
Oct. 25, 1956.

Hill, Betts & Nash, New York City, for petitioner. Edwin Longcope, David C. Wood, New York City, of counsel.

Kirlin, Campbell & Keating, New York City, for claimants. Alfred J. Skidmore, New York City, of counsel.

DAWSON, District Judge.

This case which was tried by the Court presents an issue as to liability for damage to a motorboat and for personal injuries as a result of a collision between a tug and a motor boat in the East River.

The proceeding was instituted by a petition of the Val Marine Corporation, owner of the tug Val No. 1, praying for exoneration and/or limitation of liability for losses and damages arising out of the collision. The Court has jurisdiction by virtue of 28 U.S.C. § 1333.

The collision was one between the tug Val No. 1 and a motorboat bearing the number 10K701. The collision occurred at about 12:30 A.M. on the early morning of September 2, 1953 in the East River, north of Welfare Island, and approximately 100 to 175 yards from the shore of Astoria. Claims have been filed for damage to the motorboat and for personal injuries sustained by its owner and three of his guests; no claim for damage was filed by the tug.

## The Facts

As to the following facts, no substantial dispute exists:

The motorboat was a 28' cabin cruiser with a 9' beam. It was powered by a 115 h. p. Chrysler Crown Engine with 16 knots top speed.

The other boat in the collision was the tug Val No. 1 owned by the Val Marine Corporation. It was a 70' tug, weighing approximately 68 tons, and was powered by a 300 h. p. Diesel Engine developing a top speed of between 7 and 8 knots per hour.

On the evening and in the early morning hours at which time the collision occurred, the night was clear and visibility good. There was no dispute on the part of any of the witnesses that from their respective boats they could see the lights both on the Astoria shore, to the East, and on the Manhattan shore, to the West. There is also no dispute that both vessels were showing full navigation lights.

The motorboat was returning from a fishing trip in the vicinity of Atlantic Highlands. The owner of the boat, Leonard Costas, was at the helm of this boat. The boat had put in for refueling at Sheepshead Bay and was then navigated through the upper Bay and through the East River en route to its berth at College Point in Queens. The motorboat passed up the East River through the channel which is east of Welfare Island.

The tug, after leaving a barge at a dock at East 70th Street in Manhattan, headed for Port Morris in the Bronx. It was being navigated by John Haugen, the first mate. The tug proceeded north up the channel west of Welfare Island.

The exact point of collision was a matter of some dispute but the evidence seems clear that both vessels had proceeded well beyond the northern tip of Welfare Island. Mr. Costas, who was navigating the motorboat, said that when he passed the northern tip of Welfare Island, he looked around the entire horizon and saw no ship either to starboard or port. Mr. Haugen, who was navigating the tug, stated that when he passed the northern tip of Welfare Island, he also looked around and saw no ship approaching on his starboard side. Both of the ships kept on their respective courses until the collision occurred. No whistles were blown or other signals given by either ship.

We therefore have a situation where two ships proceeding on the East River on a clear, bright, evening got to a point where neither saw the other until they were a very short distance apart. Almost immediately thereafter, they collided. How could this have happened?

Mr. Costas, who was the owner of the motorboat and who was navigating it, said that when he passed the tip of Welfare Island, he scanned the entire horizon, "port, starboard, bow and stern". He stated that he checked the traffic to the west of the Island as well as the traffic behind him and that he had a clear view. He testified that he saw no other ship and that he maintained his course until one of his passengers shouted to him that he saw a green light. At that point, which was off the shore of Astoria, some 500 yards beyond the tip of Welfare Island, Mr. Costas looked over his shoulder, saw the green light, and knew it was a boat. This boat, he said, was about 60' to 80' away from him at that moment, headed in his direction, and the interval between the time when he saw this light and the moment of impact was a question of seconds. He said that he was navigating at an average speed of 5 to 6 knots, although he stated that his average cruising speed was between 8 and 11 knots.

It was undisputed that the top speed of the tug was about 8 knots. The skipper of the tug stated that when he arrived abreast of the light at Welfare Island, he looked toward the east channel to see if any traffic was coming out, but saw none; he continued on his course until he heard a shout from one of the engineers then off duty. He stated that he then looked to starboard, saw the motorboat on a 45° angle off the stern, and heading toward the tug. He states that at this moment, the motorboat was about

5' to 10' away. He stated that the motor-boat was coming up off the starboard quarter and that this quarter was a little aft of the beam.

When the two ships collided, they hit at a point a little aft of the beam of the tug. The collision was not a direct crash, but more a side-swiping of the ships, possibly occasioned by the fact that immediately preceding the collision, the operator of the motorboat had thrown his engine in reverse and turned his rudder so as to go in a starboard direction. The operator of the motorboat said that at the time he saw the tug, it was traveling twice as fast as his boat was traveling. This seems to be open to considerable doubt since the evidence is undisputed that the tug had a top speed of 8 knots.

Inasmuch as the assessment of damages will be for a Commissioner, the sole question before this Court is the liability or non-liability of the vessels.

### Discussion

Each vessel contends that it was the overtaken vessel and that it was the duty of the other vessel to keep in such position that no collision would have occurred. The motorboat further contends that if the situation was not an overtaking, then the crossing rules applied so that it had the right of way and the tug was the burdened vessel.

There can be no dispute from the charts which were introduced in evidence, the testimony of the witnesses, and the proof as to the point of impact in the collision, that the two ships, generally proceeding in a northerly direction, were traveling a path which was convergent, and convergent at an angle of approximately 45°. Certainly, when the skippers of the respective boats sighted the other, neither of the vessels was an overtaking vessel, within the definition contained in Art. 24 of the Inland Rules for Harbors, Rivers and Inland Waters Generally, 33 U.S.C.A. § 209, for such Rules provide that an overtaking vessel is a vessel "coming up with another vessel from any direction more than two points abaft her beam, that is, in such a posi-

tion with reference to the vessel which she is overtaking that at night she would be unable to see either of that vessel's side lights". The testimony is undisputed that at the moment when those on the ships saw the other ship, each one saw the side lights of the other. At the angle and speed at which the ships were proceeding, in their converging path, it would have been possible for the skipper of each ship to see the side lights of the other ship for a substantial distance before the collision. This is, therefore, not a situation where the "overtaking" rule is applicable. Rather, it is a situation where the Court must conclude that the skippers of both vessels, despite their testimony to the contrary, failed to keep a proper observation of the other traffic on the river until they came to a point where collision became almost inevitable.

Under the circumstances, either vessel could have been sighted by the other in more than enough time to forestall the collision. The evidence indicates that each vessel had an unobstructed view of the other; neither was hidden behind Welfare Island. Furthermore, as the tug and motorboat approached the point of collision, there was a difference of only a few knots in their speeds. This small differential confirms that the tug and motorboat were within observation of each other.

The evidence compels the conclusion that both boats are liable. The Salutation, 2 Cir., 1935, 79 F.2d 609. The constituent facts in The Salutation are duplicated in this case. The collision occurred at night, but visibility was good and the relative position of the vessels such that reasonable observation would have indicated the position of one to the other in time to avert the collision. The Court held both ships liable, regardless of which was the overtaking or crossing vessel, on the ground that each had failed to discharge the minimal duty imposed upon it by failing to sight the other so as to avert the collision. Judge Hand said:

"Indeed, regardless of the rules of navigation, it is fairly apparent

that for two vessels to get so close on a clear night, without seeing each other, is alone strong antecedent reason for supposing that both must have been careless." At page 611.

■ This is in accord with the general rule in such situations:

"Indeed, when, without any adverse condition of wind or sea, with a visibility such as to enable them to sight each other at a distance of several miles, in broad water, unhampered by the sinuosity of any channel or by the proximity of land or other vessels, two vessels, fully manned and with their steering gears in good condition, come into collision, it is difficult to see how the collision could happen without fault on the part of both vessels, and common sense, in such case, is inhospitable to holding either vessel solely to blame." 15 C.J.S., Collision, § 12, p. 23.

The fact seems to be that each ship negligently failed to keep a proper lookout and thereby failed to ascertain the proximity of the other ship. If the tug had kept a proper lookout, it would have seen the motorboat on its right or approaching on its right. If the motorboat had kept a proper lookout, it would have seen the tug approaching and would have been in a position to so navigate to starboard as to avoid a collision.

The Court concludes that both of the ships were negligent and the damages should be equally divided.

■ As the petition of the Val Marine Corporation for exoneration from liability is denied, its request for limitation of liability must be considered. A value of $40,000 has been stipulated and petitioner seeks to invoke the statute allowing limitation, 46 U.S.C.A. § 183. Under the cases, a prima facie case for limitation is made by proving that the vessel was seaworthy, that no officer of the corporation owning the craft was aboard at the time of the accident, and that the crew was competent. See The George W. Pratt, 2 Cir., 1935, 76 F.2d 902;

The Annie Faxon, 9 Cir., 1896, 75 F.2d 312. At trial, petitioner presented credible evidence substantiating its compliance with these three requirements. In their post-trial briefs, proctors for claimants have not opposed the application for limitation. Accordingly, the provisions of the statute being satisfied, the petition for limitation of liability should be granted.

The foregoing shall constitute the findings of fact and conclusions of law of the Court. If either party wishes enumerated findings and conclusions, they may be submitted, within fifteen days, upon five days' notice to the other side.

Submit decree on five days' notice.