James SADOWSKI, as owner of
THE Tug MARECO,

v.

THE Tug GREMLIN, her engines, boilers, etc., and The Curtis Bay Towing Company, a Maryland corporation.

No. 3850.

United States District Court
D. Maryland, Admiralty Division.

Jan. 3, 1957.

On Petition for Rehearing Feb. 7, 1957.

Constable, Alexander & Daneker, Baltimore, Md. (John D. Alexander, Baltimore, Md., of counsel), for libelant.

Lord, Whip & Coughlan, Baltimore, Md. (George W. P. Whip, Baltimore, Md., of counsel), for claimant-respondent.

THOMSEN, Chief Judge.

This suit arises out of a collision between two tugs in the Northwest Harbor at Baltimore. Claimant-respondent admits negligence on the part of the Gremlin; the only question is whether any negligence on the part of the Mareco contributed to the collision.

In the late afternoon of January 8, 1956, the tugs Gremlin and H. S. Falk, owned and operated by claimant-respondent, were dispatched to Bethlehem Shipyard Pier 1, Key Highway, Baltimore

Harbor, to assist the S. S. Mission Carmel from her berth. The weather was good, wind fresh from the north. Captain Thomas of the Gremlin went on the bridge of the Carmel to take charge of the maneuvers. The two tugs assisted the Carmel until she was headed down the river (east); the Falk then took down her towing lights, and with her running lights up, headed down the river herself. When she was just beyond Philpot Street, the Falk's engine was cut off and she lay to on the north side of the channel, making very slight headway, waiting for the Gremlin to come and take off Captain Thomas, who had come aboard the Falk.

The Gremlin followed the Carmel down the river on the Carmel's starboard side expecting to take Captain Thomas off the ship. But when the Gremlin was near the American Sugar Refining plant, on the south side of the harbor, her mate received a telephone message to proceed across the harbor and take Captain Thomas off the Falk. Upon receiving this message, about 6:40 p. m., the Gremlin, in charge of her mate, Sapp, turned around and proceeded at about three knots across the harbor in a northwesterly direction toward the Falk, which was then some 800 feet away. The Gremlin's running lights and mast head light were burning, her towing lights having been taken down. Sapp was in the pilot house, at the wheel; no other lookout was posted. It is neither required nor customary to have any other lookout under those conditions.

Sapp testified in court that when the Gremlin was about 150 feet from the Falk, he first noticed the Mareco, 25 to 30 feet off his starboard bow. He put the Gremlin full speed astern, but after about three or four seconds collided with the Mareco on her port quarter. Sapp had testified at the Coast Guard hearing two days after the collision that he first saw the Mareco when she was about 150 feet off his starboard bow.

Shortly before the Gremlin turned to cross from the south to the north side of the harbor, the Mareco rounded Fells Point and headed westerly toward the Bethlehem Key Highway Yard. The Mareco was making about six knots, and was about twice as far from the Falk as the Gremlin was. The Mareco is a single screw diesel driven tug, 49 feet long, with a 12 foot beam. The only one aboard was James J. Sadowski, libellant's son, aged 24, who has no license, but is familiar with the Inland Rules, and has taught a seamanship class for the Coast Guard Reserve. No license is required for the operation of such a tug unless cargo or passengers are being carried. The Ruth Conway, D.C.Md., 75 F.Supp. 514, affirmed sub. nom. Harbor Towing Corp. v. Parker, 4 Cir., 171 F.2d 416.

The Mareco carried the same running lights as the Gremlin; they were all burning and in good order. Her course led her toward the bow of the Falk; and since the Falk was near the piers on the north side of the harbor, Sadowski properly decided to pass the Falk to her south, and steered a southwest course to clear the Falk's bow. As between the Falk and the Mareco, the Falk was the privileged vessel; she was not anchored, but was making slight headway on a southeast course. Sadowski therefore watched her closely, and did not see the Gremlin until they were too close to avoid a collision. When the Mareco was 50 to 100 feet off the Falk's bow, the Falk threw her searchlight in front of the Mareco and then in front of the Gremlin, which was then about 150 feet from the Falk. The Mareco held her course and speed until just before the collision, when Sadowski gave her a hard left rudder and full ahead. The impact, on the Mareco's port quarter, was sufficient to crush a 3-inch oak beam.

The parties have agreed that libellant's damages were $10,287, of which $7,087 was for repairs. The Gremlin was not damaged.

The several witnesses disagreed where the tugs were at different times, but it appears that the Mareco passed within about 50 feet of the Falk's bow, which was headed in a southeasterly direction, and that the collision occurred about 125

feet south or southwest of the Falk. The witnesses also disagreed to what extent the Gremlin had slowed down before her mate saw the Mareco, but the damage to the Mareco indicates that the Gremlin must have been making about two knots at the time of the collision.

■ No excuse is or could be offered for the failure of the Gremlin to see the Mareco and to take proper steps to avoid the collision. The issue is whether the Mareco was also negligent and, if so, whether such negligence contributed to the happening of the collision. This issue must be considered in the light of the well-established rule that where the fault of one party is obvious and inexcusable, the evidence to support fault on the part of the other must be clear and convincing, in order to make a case for apportionment. The City of New York, 147 U.S. 72, 13 S.Ct. 211, 37 L.Ed. 84; The Victory (The Plymothian), 168 U.S. 410, 18 S.Ct. 149, 42 L.Ed. 519; The Bright, 4 Cir., 124 F.2d 45; Compania de Navegacion Cebaco, S. A. v. The Steel Flyer, 4 Cir., 200 F.2d 643, certiorari denied Isthmian S. S. Co. v. Compania, 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356.

The Inland Rules, 33 U.S.C.A. § 151 et seq., provide:

"§ 204. *Steam vessels crossing.* Art. 19. When two steam vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other."

"§ 206. *Vessel having right of way to keep course.* Art. 21. Where, by any of these rules, one of the two vessels is to keep out of the way, the other shall keep her course and speed."

"§ 221. *Usual additional precautions required generally.* Art. 29. Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

There was no statutory or customary obligation on either the Mareco or the Gremlin to maintain a lookout in addition to the man at the helm. But that man, of course, was bound to keep a proper lookout, under all the circumstances, which included darkness and a busy harbor. Libellant argues that since, as between the Mareco and the Falk, the Mareco was the burdened vessel, Sadowski was required to keep a close watch on the Falk, and should not be blamed for failing to see the Gremlin, approaching off his port bow. The Mareco's situation vis-a-vis the Falk is certainly a circumstance or condition which must be considered in assessing the blame. The Pocomoke, D.C.E.D.Va., 150 F. 193, Waddell, D. J. Nevertheless, Sadowski should have kept a sharper lookout ahead than he did.

■ This conclusion, however, does not settle the issue. It must appear that his failure was a fault contributing to the collision. "The provision * * * is that a vessel is not to be exonerated from the consequences of any neglect to keep a proper lookout. It does not say that a vessel shall, because of not keeping a proper lookout, be visited with the consequences of a collision. If the collision does not result as a consequence of neglecting to keep a proper lookout, the vessel is not thereby made responsible for the consequences of the collision." The Blue Jacket, 144 U.S. 371, 390, 12 S.Ct. 711, 718, 36 L.Ed. 469. "If a vessel, therefore, fails 'to see or hear what would not have been followed by any change of course,' she is not guilty of contributory fault (the Victory, [1897] 168 U.S. 410, 425 [18 S.Ct. 149, 42 L.Ed. 519])." Griffin on Collision, sec. 114, p. 284.

■ Even if Sadowski had seen the Gremlin approaching on his left at three knots, he had a right to assume that she would obey the rules and yield the right of way to the Mareco, especially since the Gremlin was or should have been

slowing down as she approached the Falk. Belden v. Chase, 150 U.S. 674, 699, 14 S. Ct. 264, 272; 37 L.Ed. 1218; Buckeye S. S. Co. v. Union Towing & Wrecking Co., D.C.N.D.Ohio, 68 F.Supp. 749. In Pacific-Atlantic S. S. Co. v. United States, 4 Cir., 175 F.2d 632, 639, Judge Parker quoted from The Piankatank, 4 Cir., 87 F.2d 806, as follows:

> " 'Where two courses are open to a vessel, and particularly to the privileged vessel, one to follow the prescribed rules and the other to depart from them, the duty is imperative to observe the rules, and to assume that an approaching vessel will do likewise, until after the danger has become so manifest as to show that there is no proper choice of judgment other than that of departing from the rules. Any other course would lead to confusion and be a most prolific source of accidents. Indeed the rule is so imperative that it does not give a navigating officer any general latitude as to obeying the rules, and permits a departure only when necessary to avoid immediate, and not remote or problematical, danger, and then only to the extent required to accomplish that object.' "

The Mareco was required, as the holding-on or privileged vessel under Art. 19, to keep her course and speed until Sadowski saw or should have seen that a collision was imminent. That is just what he did. Under those circumstances, the failure of the Mareco to keep a better lookout was a non-contributory fault. Griffin, op. cit., pp. 284–285, states:

> *"Cases where the vessel is not required to take action.* Where a sailing vessel required to hold course and speed as against a steamer, or a steamer which is the holding-on vessel under the crossing rule, has actually performed her duty and navigated as she should have done if her navigator had had full knowledge of the situation, the fact that her lookout was defective has frequently been held a non-contributory fault."

The leading case is The Fannie, 11 Wall. 238, at page 243, 20 L.Ed. 114, where the court said: "If the schooner held her course, it was all that the steamer had a right to require and, whether she had a proper lookout or not, it was her duty to do precisely what she did." This rule has been applied by leading admiralty courts over the years. The Bermuda, D.C.S.D.N.Y., 17 F. 397; The Fannie Hayden, D.C.Me., 137 F. 280; The Norfolk, D.C.Md., 297 F. 251, modified on other grounds, Phillips v. Clyde S. S. Co., 4 Cir., 17 F.2d 250; The Piankatank, 4 Cir., 87 F.2d 806; Lind v. United States, 2 Cir., 156 F.2d 231; Pacific-Atlantic S. S. Co. v. United States, 4 Cir., 175 F.2d 632.

In The Bermuda, supra, a steamer struck the port quarter of a tug in the Hudson River, on converging courses. The tug did not see The Bermuda "approaching until she was close upon them." 17 F. at page 398. Judge Addison Brown held that the tug as the holding-on, privileged vessel had the bounden duty to keep her course and speed until collision was imminent, and said, 17 F. at page 398:

> "The tug was at the time in charge of her captain, who acted as pilot, and there was no other lookout either forward or aft. No whistles from The Bermuda were heard; nor were those on board aware even that The Bermuda was approaching until she was close upon them; and the captain, after seeing the Bermuda, had barely time to escape from the pilot-house, and went down with the vessel. There was plainly gross negligence on the tug in regard to keeping any proper lookout for other vessels; and upon this ground the tug must have been held jointly liable for the loss, were I not satisfied from the evidence that there was nothing which the tug ought to have done, or could properly have done, to avoid the collision had a lookout been properly kept and the

motions of the Bermuda promptly reported. If the course of the Bermuda had been closely watched from the first, the tug would still have been bound to keep her course precisely as she did. She was bound to keep her course and not to change it, either to the right or to the left, whereby the measures which the Bermuda might take, and was bound to take, to avoid her might be thwarted. * * * "

In The Norfolk, supra [297 F. 254], Judge Soper said:

"There is more in [her] claim that her lookout was ineffective. No reason was or could be given to explain the failure of her navigator to see the Cynthia sooner, or hear her signals when they were given. Such inattention justifies the charge. It cannot be said, however, that this neglect contributed to the accident. Had the Cynthia been seen and heard, the Norfolk would have been justified in declining to yield the right of way, and in proceeding upon her course."

The rule applied in the cases cited produces a just result in this case. I hold that the Mareco is not chargeable with any negligence which contributed to the happening of the collision. Libellant is entitled to his full damages.

### On Petition for Rehearing

■ Respondent has filed a petition for a rehearing, contending for the first time that the Mareco violated the Pilot Rules for Inland Waters promulgated by the Coast Guard, formerly known as Inspectors' Rules and Pilot Rules, by failing to give a signal as she approached the Gremlin. Respondent did not refer to these Rules at the trial nor offer them in evidence, but they are published in the Code of Federal Regulations (1949 Ed.), and this court takes judicial notice of them under 44 U.S.C.A. §§ 307, 311 and note, Exec.Order No. 9930. See 33 C.F.R. 80.01, 13 F.R. 7303, 13 F.R. 519, 19 F.R. 8038.

■ Respondent refers to section 80.3 of said Rules, formerly Pilot Rule III, and cites State of Maryland v. Standard Oil Co., D.C.Md., 8 F.2d 514, Soper, D.J. as authority for its applicability in this case. Sec. 80.3 provides:

"*Vessels passing each other.*— The signals for passing, by the blowing of the whistle, shall be given and answered by pilots, in compliance with the rules in this part, not only when meeting 'head and head,' or nearly so, but at all times when the steam vessels are in sight of each other, when passing or meeting at a distance within half a mile of each other, and whether passing to the starboard or port * * *."

In the Standard Oil case, the two ships were approaching in a passing situation showing their green lights to each other, and a crossing situation did not develop until one ship cut in front of the bow of the other. The ships in that case met generally head and head, but not exactly end-on, having approached considerably to the starboard of each other. The question was whether Rule III was inconsistent with Title 33 U.S.C.A. § 203, Art. 18 of the Inland Rules, which deals with vessels "approaching each other head and head, that is, end on, or nearly so". Judge Soper noted that Rule III provides "that vessels shall give passing signals not only when meeting end on, but also when passing or meeting in other situations" [8 F.2d 518], and held that the Rule was not inconsistent with the statute, but an additional rule promulgated in the interests of safety. He was not dealing with a true crossing situation and his statement quoted above should not be construed as holding that Rule III applies to a crossing situation, especially in view of decisions in the Second and Fourth Circuits.

In The Boston Socony, 2 Cir., 63 F.2d 246, at page 248, the court said:

"* * * Rule 3 of the Supervising Inspectors Rules is relied upon as imposing a duty to signal; but in our opinion that rule cannot

be construed as applying to vessels on crossing courses. * * *"

See also The City of Tokio, 2 Cir., 77 F.2d 315, 317.

In Compania De Navegacion Cebaco, S. A. v. The Steel Flyer, 200 F.2d 643, the Fourth Circuit was faced with a crossing situation, and Judge Soper, who wrote the opinion, gave no indication that he thought Rule III applied. On the contrary, his opinion shows clearly why the Rules provide that vessels should signal when meeting head and head, but need not signal when on crossing courses. He said, referring first to vessels meeting head and head:

"* * * in such case it is the duty of each vessel to pass on the port side of the other, and either vessel shall give as a signal of her intention one short blast of the whistle which the other vessel shall answer promptly by a similar blast of the whistle and thereupon the vessels shall pass on the port side of each other; but if the situation of the vessels indicates a starboard passing, either vessel shall give two short blasts which the other vessel shall answer and they shall pass on the starboard side of each other.

"In such case, there is provision for mutuality of understanding; but in this case the vessels were not meeting head on or nearly so, but were on crossing courses and therefore Articles 19 and 21, to which reference has been made above, were applicable. *These rules make no provision for the giving and acceptance of signals since they clearly provide that the vessel which has the other on her starboard side shall keep out of the way of the other while the other shall keep her course and speed. The obligation of the Domina under the circumstances was definite and precise. * * *"* 200 F.2d at page 645. (Italics mine.)

Respondent also referred to Sections 80.1, 80.2 and 80.7, former Pilot Rules I, II, and VII, which provide:

"*80.1 Danger signal.*—If, when steam vessels are approaching each other, either vessel fails to understand the course or intention of the other, from any cause, the vessel so in doubt shall immediately signify the same by giving several short and rapid blasts, not less than four, of the steam whistle, the danger signal."

"*80.2 Cross signals.*—Steam vessels are forbidden to use what has become technically known among pilots as 'cross signals,' that is, answering one whistle with two, and answering two whistles with one."

"*80.7 Vessels approaching each other at right angles or obliquely.*— When two steam vessels are approaching each other at right angles or obliquely so as to involve risk of collision, other than when one steam vessel is overtaking another, the steam vessel which has the other on her own port side shall hold her course and speed; and the steam vessel which has the other on her own starboard side shall keep out of the way of the other by directing her course to starboard so as to cross the stern of the other steam vessel, or, if necessary to do so, slacken her speed or stop or reverse.

"If from any cause the conditions covered by this situation are such as to prevent immediate compliance with each other's signals, the misunderstanding or objection shall be at once made apparent by blowing the danger signal, and both steam vessels shall be stopped and backed if necessary, until signals for passing with safety are made and understood."

Rules II and VII were discussed in Postal S. S. Corp. v. El Isleo, 308 U.S. 378, 60 S.Ct. 332, 84 L.Ed. 335, where it was held that these Rules should be read in connection with Inland Rules, Articles 19, 20, 21, 22, 23 and 27, 33 U.S.C.A. §§ 204, 205, 206, 207, 208, 212. On remand to the Second Circuit, Postal S. S. Corp.

v. Southern Pac. Co., 112 F.2d 297, 298, the court said:

> "There can be no doubt that the Supreme Court meant to hold that in a crossing case, when the holding-on vessel gets two blasts from the giving-way vessel, which are unacceptable to her, she must neither cross the signal, nor keep her speed, but must at least stop her engines, and if necessary back, 'until signals for passing with safety are made and understood'."

The El Isleo was a very different case from the case at bar, and is no authority for the proposition that the Mareco should have done anything that she did not do; no signal was given by the Gremlin that she did not intend to yield the right of way, but on the contrary the Gremlin was slowing up preparing to stop.

■ So far as Rule I is concerned, the Mareco should have given a danger signal if it saw, or should have seen, that the Gremlin was obviously not going to respect the right-of-way of the Mareco. However, as we have seen, the Gremlin had slowed down to two miles per hour, and if Sadowski had kept his eye on her all of the time, he would have had a right to assume that she would either stop and let him pass or that she would make the slight turn necessary to pass behind the Mareco.

■ Counsel for respondent argues that the Mareco should have slowed down or turned to starboard or to port. This ignores the duty of the Mareco to hold her course and speed, 33 U.S.C.A. § 206, Article 21. In Wilson v. Pacific Mail S. S. Co., 276 U.S. 454, at 462, 48 S.Ct. 369, 370, 72 L.Ed. 651, the court quoted from The Delaware, 161 U.S. 459, 469, 16 S.Ct. 516, 40 L.Ed. 771, as follows:

> " 'The cases of The Britannia, 153 U.S. 130, 14 S.Ct. 795, 38 L.Ed. 660, and The Northfield, 154 U.S. 629, 14 S.Ct. 1184, 24 L.Ed. 680, must be regarded, however, as settling the law that the preferred steamer will not be held in fault for maintaining her course and speed, so long as it is possible for the other to avoid her by porting, at least in the absence of some *distinct indication* that she is about to fail in her duty. If the master of the preferred steamer were at liberty to speculate upon the possibility, or even of the probability, of the approaching steamer failing to do her duty and keep out of his way, the certainty that the former will hold his course, upon which the latter has a right to rely, and which it is the very object of the rule to insure, would give place to doubts on the part of the master of the obligated steamer as to whether he would do so or not, and produce a timidity and feebleness of action on the part of both, which would bring about more collisions than it would prevent. Belden v. Chase, 150 U.S. 674, 14 S.Ct. 264, 37 L.Ed. 1218; The Highgate, 62 L.T.R. 841; S.C. 6 Asp.Mar.Law Cases, 512.' "

In the case at bar, if the Mareco had turned to port when the failure of the Gremlin to yield the right-of-way was distinctly indicated, there would have been grave danger that she would run head-on into the Gremlin; if she had turned to starboard, there would have been danger of running into the Falk; if the Mareco had slowed up and the Gremlin had continued as she did, the Mareco might well have run head-on against the Gremlin's pilot house and caused far greater damage to both ships.

Respondent also cited Petition of Val Marine Corp., D.C.S.D.N.Y., 145 F.Supp. 551, and The Salutation, 2 Cir., 79 F.2d 609. Those cases have some similarity to the instant case, but in neither of those cases was there a third vessel involved. Here there was a third vessel on the starboard side of the Mareco, to which she was required to give primary attention. Moreover, in The Salutation there was considerable question whether the tug, which had the tanker on her port side, had established a course; and

the Court of Appeals evidently felt that if a sharp watch had been kept, it would probably have been obvious in season that the tanker was coming too close aboard to extricate herself unaided. In the present case that was not obvious until immediately before the collision, when it was too late for the Mareco to do anything effectively.

Admittedly, this is a close case, but I adhere to my previous conclusion that the failure of the Mareco to keep a better look-out was a non-contributory fault under the authorities cited in the principal opinion. I will sign an appropriate decree, but will not charge respondent with interest before the date of this opinion.