## THE CLARION.

*(District Court, E. D. Michigan.   January 23, 1886.)*

1. COLLISION—NEGLIGENT NAVIGATION—STEAMER STARBOARDING AND ATTEMPT-
   ING TO CROSS BOWS OF ANOTHER STEAMER.
     A steamer which starboards, and attempts to cross the bows of another
   steamer which has the right of way, does so at her peril, and will be held
   answerable for the consequences.
2. SAME—MUTUAL FAULT—DIVISION OF DAMAGES.
     Where one vessel is clearly shown to have been in fault, there should also
   be clear evidence of a contributing fault on the part of the other vessel to
   justify a division of damages.

This was a libel for a collision between the railway transfer steamer
Lansdowne and the propeller Clarion, which occurred early in the
morning of July 15, 1885, in the Detroit river, opposite the premises
of the Michigan Central Railroad Company, in the city of Detroit.
The libel averred that the Lansdowne left her slip on the American
side of the river about half-past 1 in the morning, laden with a train
of passenger cars, and took her course diagonally across the river for
her slip upon the Canada side, nearly two miles above her point of
departure.   When about the middle of the river, and somewhat on
the Canadian side, and a little below the Canada Southern Railway
slip, she made the Clarion coming down the river exhibiting her white
and red lights.   The Lansdowne blew one blast of her whistle, and
ported.   The Clarion did not reply at once, but kept on showing her
red light until within a short distance of the Lansdowne, when she
blew two blasts of her whistle, and suddenly changed her course, ex-
hibiting her green light, heading apparently for the bow of the Lans-
downe.   It was then too late for the Lansdowne to change her course,
but she immediately blew another signal whistle, and reversed her
engines.   The Clarion came on, however, showing both colored lights,
and struck the Lansdowne upon her port wheel-house, doing damage
to a large amount.   The case of the Clarion was that after passing
Belle isle, above the city on the Canada side, she ported, and drew
over to the American side of the river, within five or six hundred feet
of the docks along the front of the city, for the purpose of calling the
attention of her Detroit agents to the fact that she was passing the
city, as was the usual custom with that line of boats; that having
given her signal of four long and four short whistles opposite the office
of the company, she starboarded for the purpose of clearing the "mid-
dle ground" opposite the Michigan Central Railroad freight-house and
resuming her course down the river on the Canadian side; that about
this time she heard a single whistle from the Lansdowne, which was
coming up the river on her starboard bow, showing both her colored
lights, the Clarion then showing her white and green lights to the
Lansdowne; that deeming it impossible to port and pass the Lans-
downe on the port side on account of the proximity of the middle

ground, the Clarion immediately replied with two blasts, when the Lansdowne again sounded a single blast, and the Clarion thereupon at once stopped and backed; that up to the time the Lansdowne sounded her second signal she was approaching on the starboard bow of the Clarion, but soon thereafter she ported, and shot across the bows of the Clarion, and so brought about the collision.

The court was assisted upon the argument by Commander Cook, of the navy, and Capt. Warner, of the revenue marine, sitting as nautical assessors.

*H. A. Harmon* and *H. H. Swan*, for libelant.

*Moore & Canfield*, for claimant.

BROWN, J. We have found but little difficulty in reaching a conclusion in this case. Indeed, there is no such dispute with regard to the facts as would affect materially the result. We think the Lansdowne left her slip about the time the Clarion passed the dock of Mr. Chesebrough, the agent of the line, and that her failure to hear the eight signals of the Clarion was owing to the fact that the attention of her master and crew was diverted, or rather was not fixed upon the approaching vessel, until she had left the slip, and that very soon after that she sounded her signal of one whistle.

So far as the locality of the collision is concerned, I am advised by the nautical assessors that in their opinion it took place between the Michigan Central Railway elevator A and the Canada Southern slip, on the opposite side of the river, and at a point somewhat upon the American side, with room, however, quite sufficient for the Clarion to have passed down between the Lansdowne and the middle ground, which lies immediately off the freight depot of the Michigan Central Railroad. I am quite satisfied with their conclusion upon this point.

There is one fact developed by the testimony which we regard as the pivotal fact in the case, and one of much more importance than the mere question of locality; and that is that at the time the Lansdowne blew her first whistle she was showing both her colored lights to the Clarion, and we also think that the Clarion was probably showing both her colored lights to the Lansdowne, although it is claimed by the Clarion that the Lansdowne was then upon her starboard bow, in which case the Clarion would only exhibit her green light. The two steamers then were approaching either end on, or nearly end on, within the eighteenth rule, or were upon crossing courses within the nineteenth rule, the Clarion having the Lansdowne upon her starboard side. In either case, it was the duty of the Clarion to port, or at least to keep out of the way. So, too, upon either theory, the Lansdowne was perfectly justified in blowing a single whistle and porting. Assuming that she was keeping somewhat on the American side, we do not find that there is any rule or custom that would forbid her taking that course, provided she left sufficient room to permit the Clarion to pass down upon the port side. Even if we were to

confine ourselves to the testimony of Capt. Harriman, and find the collision took place on the American side of the river, we do not feel bound to condemn the Lansdowne.

Upon receiving the single whistle of the Lansdowne, it was the clear duty of the Clarion to answer at once with one blast of her whistle, and to keep down on the American side of the channel. The Lansdowne was bound to give her room enough for her to pass down between her and the middle ground, and the Clarion was bound to presume that she would do so. Even if the master of the Clarion was afraid he would be crowded too far over upon the American side, he should not have, starboarded, but should have stopped, or possibly stopped and reversed. At any rate he should have stopped, and the very worst that would have happened to him would have been to drift ashore on the middle ground, from which he could have been gotten off with little or no loss. In any view of the case, it was a gross fault upon the part of the Clarion to blow two blasts of the whistle and starboard her wheel. In so doing she acted at her peril, and must be held answerable for the consequences. Bearing in mind that the two steamers were approaching each other at a combined speed of 20 miles an hour, and that they must have been less than a mile apart at the time the Lansdowne blew her first signal, the chances of the Clarion crossing the bows of the Lansdowne before the latter reached the intersection of the two courses were very slight. I know of no case in which a vessel has been justified in disregarding a proper signal from an approaching vessel, and proposing a departure from the rule of the road, after such approaching vessel had signified her desire to adhere to it.

In the case of *The Milwaukee*, Brown, Adm. 313, 321, it was held by this court that the burden is upon a vessel claiming a departure from the statutory requirement to prove "(1) that a proposition to depart from the statute was made by her by means of signals prescribed by rule of the supervising inspectors, and in due season for the other vessel to receive the proposition, and act upon it with safety; (2) that the other vessel heard and understood the proposition thus made; (3) that the other vessel accepted the proposition." "These facts," says Judge LONGYEAR, "must be made out by clear and satisfactory proofs. They must not be left to inference. The statute in question is one of vital importance for the protection of life and property upon the waters, and it will not do to hold a party blameless for a departure from its plain provisions upon a plea of an agreement or license to do so, except where such agreement or license is admitted, or is made out beyond all reasonable doubt by clear and satisfactory proof. Where the agreement is denied, and the evidence is conflicting and contradictory, and does not clearly preponderate in favor of such agreement, the statute must govern, and the responsibility of parties must be determined accordingly." I regard this as a sound enunciation of the law upon the subject. In this

case the proposition to depart from the statute is the more excusable from the fact that the Lansdowne had already signified her intention to adhere to it.

We do not wish to be understood as extenuating in any degree the obvious fault of the Lansdowne in sailing without a lookout. We have no doubt that, having regard to the number of vessels in the Detroit river, to the valuable lives that the Lansdowne had on board, to her great size and speed, and the tremendous energy with which she moved, that it was grossly careless for her to navigate without a lookout, and we should promptly condemn her in this case did we find that this contributed to the collision; but we think that in her management, in the course she took, in the signals she gave to her wheel, to her engineer, and to the approaching vessel, she was guilty of no fault. She appears, too, to have sighted the Clarion as soon as she left her slip. In this connection I call attention to the language of Judge WOODRUFF in the case of *The Comet*, 9 Blatchf. 329, in which he says that where one vessel has been guilty of a clear fault, there should also be clear evidence of a contributing fault on the part of the other vessel in order to divide the damages. "It should not be enough that they make the care and skill and good management of the other vessel doubtful." We are unable to put our finger upon any fault committed by the Lansdowne, aside from the technical one of being insufficiently manned.

There must be a decree for the libelant, and a reference to a commissioner to assess the damages.