MEYERS EXCURSION & NAVIGATION CO. *v.* THE EMMA KATE ROSS.

*(District Court, D. New Jersey. March 4, 1890.)*

1. COLLISION—CROSSING STEAMERS.
   Under 23 U. S. St. at Large, 441, which provides that, "if two ships under steam are crossing so as to involve risk of collision, the ship which has the other on her own starboard side shall keep out of the way of the other," when a collision occurs under such circumstances the vessel whose duty it is to keep out of the way should be held in fault, unless clear and undisputable evidence establishes the contrary.

2. SAME—ABSENCE OF LOOKOUT.
   The absence of a lookout on the other vessel is immaterial where it does not appear that the collision could in any wise be attributed to his absence.

In Admiralty.  Libel for damages by collision.
*Wing, Shoudy & Putnam*, for libelant.
*R. D. Benedict*, for claimants.

GREEN, J.  This is an action for collision which occurred on the night of June 23, 1888, on the Hudson river, a short distance south of the ferry of the Pennsylvania Railroad Company, between the steam-tug Emma Kate Ross and the steam-boat Chrystal Stream.  From the evidence in the cause, it appears that about 10 o'clock on the evening of the 23d of June, 1888, the Chrystal Stream was proceeding down the river, on a southerly course, parallel with the New Jersey shore, and about 300 yards distant easterly from the exterior line of piers.  She was making for the docks of the Communipaw Coal Company to tie up for the night.  The tide was about "slack-water, nearly slack;" "ebb on the Jersey shore."  "There was no wind."  "It was a bright, moonlight night; almost as bright as day."  At the same time the steam-tug Emma Kate Ross left pier No. 1 North [Hudson] river, New York city, bound to Jersey City.  Her captain had left her at the pier, and she was in charge of the mate.  Her course was diagonally across the river, heading at first, apparently, for the Erie Railroad ferry, and showing those on board the Chrystal Stream only her red light.  Later, her course changed slightly, and bore a little more to the south and west, so that her green light came into view to the pilot of the Chrystal Stream.  Her objective point was the dock of the Red Star Line Steam-Ship Company, adjoining the ferry-slip of the Pennsylvania Railroad Company at Jersey City.  The two vessels proceeded upon their respective courses without any lessening of speed, and rapidly approached each other.  When very close, the Chrystal Stream signaled to the tug that she intended to keep on her course.  This signal was immediately acknowledged by the Emma Kate Ross, but, it is alleged, was misunderstood by the mate in charge of the tug.  It had been, admittedly, up to this time, the intention of the pilot of the tug to cross the bow of the Chrystal Stream, but, seeing the danger of the collision which now seemed imminent if he persisted in that intention, he suddenly changed his plan, and, throwing his wheel hard a-port, gave the signal to his engineer to back at full speed.  This attempt to avoid the collision was, unfortunately, unsuccessful; and, despite the effort, the tug ran her stem into the port side of the Chrystal Stream at a point distant about 50 feet from her stern, breaking the wheel beam and crank, the holding down bolts in the main deck, and the eccentric rod, and carrying away the A frame, and doing some other damage.  It is for these damages that this libel was filed.

The testimony taken in the cause touching the negligence of either vessel is contradictory, and difficult to reconcile with any theory.  But, after careful consideration, I think the weight of the evidence sustains these findings and conclusions:  (1) That the two vessels were upon "crossing courses."  (2) That not only were both vessels in plain view of each other, but each was actually seen by the other some time before the

collision. (3) That the admitted intention of the Emma Kate Ross was to cross the bow of the Chrystal Stream; her pilot judging that he had plenty of time and space so to do,—being so confident in this respect that he did not deem it necessary to warn the Chrystal Stream of such purpose by any signal. (4) The Chrystal Stream kept on her course, straight down the river, without change, as she had the right, and in fact was bound, to do. Of her intention to keep such course she duly notified the Emma Kate Ross by whistle. (5) That, as it turned out, the pilot of the Emma Kate Ross evidently miscalculated the speed of his own vessel, or the speed of the Chrystal Stream, or the distance between the two vessels, and, finding that by keeping on the course he was then holding a collision was imminent, sought to avoid such disaster by backing his engine at full speed, and porting his helm. (6) Despite this effort on the part of the pilot of the Emma Kate Ross, the collision occurred,—the tug striking the Chrystal Stream head on; the result of the collision clearly showing that, notwithstanding her engine was reversed, the tug was moving forward with considerable momentum.

The duty cast upon vessels situated as these were is precise and clear. "If two ships under steam are crossing so as to involve risk of collision, the ship which has the other on her own starboard side shall keep out of the way of the other." 23 U. S. St. at Large, 441; *The Corsica*, 9 Wall. 630; *The Hansa*, 5 Ben. 502; *The Cayuga*, 14 Wall. 275. In the case at bar, it is undisputed that the Emma Kate Ross had the Chrystal Stream on her own starboard side from the moment the vessels came into sight of each other until the moment of collision. The mate in command of the tug admits this in his testimony. The duty of keeping out of the way of the Chrystal Stream was clearly upon the Emma Kate Ross. The collision shows that she did not do so. It was her rashness in attempting to cross the bow of the Chrystal Stream which brought about the result. The Chrystal Stream kept on her course, as it was imperative for her to do. It was her duty to assume that the tug would implicitly obey the regulation "to keep out of her way." Had the Chrystal Stream changed her course in anticipation of the motion of the tug, she would have been guilty of a fault. A vessel whose duty it is to keep her course should not anticipate the movements of the other vessel, and give way. The safety of navigation depends, essentially, upon the certainty which results from exact adhesion to general and well-known regulations. *The Sunnyside*, 1 Brown, Adm. 227; *The Clement*, 2 Curt. 363; *The Gitana*, L. R. 2 Adm. & Ecc. 350; *The Ariadne*, 13 Wall. 475. The Emma Kate Ross was guilty, then, of a breach of a well-known duty. The omission of a known legal duty is such strong evidence of negligence and carelessness that, in every case of collision happening under such circumstances, the offending vessel should be held in fault, unless clear and indisputable evidence established the contrary. *Taylor v. Harwood*, 1 Taney, 444; *The Hercules*, 17 Fed. Rep. 606; *The Eleanora*, 17 Blatchf. 88. The application of this principle constrains me to find that the Emma Kate Ross was in fault, and must be held responsible for the damages resulting from the collision.

THE WENSLEYDALE. 829

It was urged upon the oral argument of this cause, by the claimants, that, as there was no lookout upon the Chrystal Stream, she should be held in fault in consequence of this breach of regulations. The evidence as to the alleged absence of the lookout from his station is very contradictory. While the claimants offered evidence, negative in its character, tending to prove that a certain witness did not see the lookout on the Chrystal Stream just previous to the collision, the libelants produced witnesses who testified to personal knowledge of his presence then at his post of duty. It is not necessary, however, to analyze or weigh these conflicting statements. It is enough to say that, under the circumstances of the case, the absence of the lookout on the Chrystal Stream, if he were absent, does not relieve the Emma Kate Ross of responsibility. There is no dispute that each vessel was in plain view of, and was plainly seen by, the other, a long time before the collision. Nor is there any pretense that the collision could be in any wise attributed to the absence of a lookout. A fault which has no ill consequences is immaterial. *The Morning Light*, 2 Wall. 550; *The Annie Lindsley*, 104 U. S. 185, 191; *The George Murray*, 22 Fed. Rep. 117. There must be a decree for the libelants, with the usual reference to ascertain damages.