## THE LUCKENBACH.

### THE GEORGIA v. THE LUCKENBACH.

(District Court, E. D. Virginia. December 5, 1891.)

**COLLISION IN HARBOR—STEAMER AND TUG—RULE 19.**

A tug, rounding Town Point, in Norfolk Harbor, at a speed of five or six miles an hour, suddenly came in sight of a steamer which had just left her wharf, and acquired a speed of four or five miles an hour, heading out into the harbor towards Portsmouth. The steamer blew one whistle, and kept her course. The tug replied with two whistles, and, putting her helm to starboard, attempted to cross the steamer's bow. The steamer promptly reversed, but could not avoid collision. At the time of first seeing each other, the stem of the steamer was only about 75 yards from the place of collision. No other vessels were near, to

embarrass the management of either colliding vessel. *Held* that, at the time the vessels first perceived each other, they were so near together that collision was inevitable, and that no fault was attributable to either in respect to the signals given; that the tug, having the steamer on her starboard side, was bound, under rule 19, to keep out of the way, and that rule 19 applied to the case, notwithstanding that the supervising inspectors, in their note to the rules of navigation, say that such rules are to be complied with, except when steamers are navigating in a crowded channel, or in the vicinity of wharves; and that the tug was solely in fault for approaching a bend, which excluded the view of other vessels, at a rate of speed which rendered it impossible for her to fulfill her duty of keeping out of the way after they came in sight. Affirmed in 1 C. C. A. 489, 50 Fed. 129.

These were cross libels by the owners of the steamer Georgia and of the tug Luckenbach against those vessels, respectively, to recover damages for a collision between them in Norfolk Harbor.

White & Garnett, for the Georgia.
Sharp & Hughes, for the Luckenbach.

HUGHES, District Judge. On the 9th of May last, between 4 and 5 o'clock p. m., a collision occurred in Norfolk Harbor, off Town Point, between the steam tug Luckenbach and the passenger steamer Georgia, causing serious damage to both vessels. Both ships were under headway at the time of collision,—that is to say, were moving forward on the water,—although their engines had just before been reversed. The Georgia is a large vessel, built for speed,—300 feet long,—driven by a propeller. Though a fast boat, yet, on account of being a propeller, she is, like all such vessels, comparatively awkward to handle in small spaces, on sudden emergencies, in a contracted harbor. The Luckenbach is also a propeller, built and used for towing purposes, and, to some extent, is similarly unmanageable in emergencies. Neither vessel was embarrassed at the time of collision by the near presence of any other ship in the channel. The tug was moving on a course about N. W. by W. ½ W.; and the Georgia, on one about S. by W., or S. ½ W. Their courses, therefore, crossed each other. At Town Point the wharf makes two obtuse angles from N. W. by W. ½ W. to N., which are 210 yards distant from each other, and are equivalent, together, to one angle of about 140 degrees. There are structures on the wharves of this angle which prevent a navigator moving northwardly along the wharves, from the direction of the ferries, from seeing ships that may be coming up the channel of Elizabeth river from any position north of Town Point, until he arrives well abreast of the point, and 340 yards from the Baltimore wharf. The place at which this collision occurred is in dispute. On behalf of the tug, it is placed opposite to about midway of the space between the two angles in the wharf of Town Point, which I have described. On the part of the Georgia, it is placed nearly opposite of the northernmost of these angles,—a little southwardly of that angle. The collision occurred between one and two hundred feet from the wharf. It is impossible, in an attempt to state the facts of this case, to avoid falling into violent contradiction with some portion or other of the unusually conflicting

and voluminous evidence that has been taken on either side. Fortunately, most of the evidence fails to affect or conflict with the few simple facts upon which the case turns. Most of it is immaterial, in respect to those few simple facts, and it would be as useless as tedious to attempt a thorough analysis of these parts of it. The crucial questions are: (1) How fast was the tug moving when about to round Town Point? (2) Was the Georgia at that moment in motion, under headway, and at what speed? (3) What did each vessel do on seeing the other; it being an indisputable, if not an admitted, fact that the tug had the Georgia on her starboard hand?

I conclude from a comparison of all the evidence that the Luckenbach was moving, at the time of coming in sight of the Georgia in rounding Town Point, at the rate of five to six miles an hour. I gather from all the evidence that at that moment the Georgia had got under way, after emerging from her slip, and had attained a headway that gave her a speed of about four or five miles an hour. Furthermore, the evidence discloses that the Georgia gave the first signal after the two vessels came in sight; that signal being one whistle, directing the tug to pass to the right (port to port), and that the tug answered with a cross signal of two whistles, indicating her intention to pass to the left (starboard to starboard), and thereupon put her helm hard to starboard, and held it there until the ships were in collision. The Georgia replied to the cross signal of the tug with an alarm signal, and backed her engine. Examining the chart, and measuring with compasses, I find that, if the collision occurred at the point fixed by the diagram of counsel for the tug, that point was 215 yards from the southeast corner of the Baltimore wharf, which the Georgia had left, and 145 yards from the place which the tug had reached, off the Carolina wharf, when she first saw the Georgia. These, of course, are approximate distances. If the collision occurred at the point indicated by the diagram of counsel for the Georgia, the distance was 210 yards from the Baltimore, and 250 yards off from the Carolina, wharf,—again speaking approximately. These distances are important as showing the imminent danger of collision, and the speed at which the vessels were moving. If the point of collision indicated by counsel for the Georgia be the true one, the Georgia was moving rather more slowly than I have above supposed, and the Luckenbach rather more rapidly. But in either event the joint speed of the two vessels in approaching each other at the time of the Georgia's first signal was, as I estimate, about 10 miles an hour, or nearly 300 yards a minute,—each ship at about half that speed. If the speed of the boats was only 4 miles an hour, they approached each other at the rate of 8 miles an hour, or about 245 yards a minute, each moving at half that speed.

I have stated the crucial questions of fact in this case. The question of law is whether or not the tug was under obligation to obey the nineteenth fundamental law of navigation, which provides that "if two vessels under steam are crossing so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other." This rule or law applies not merely

in the open seas and in open expanses of navigable waters, but is as often enforced in close harbors and in the vicinity of wharves. In the following cases the collisions all occurred in this latter class of waters, viz.: The Johnson, 9 Wall. 146; The Corsica, Id. 630; The E. A. Packer, 140 U. S. 360, 11 Sup. Ct. 794; The Admiral, 39 Fed. 574; The Emma Kate Ross, 41 Fed. 826; The Panama, 46 Fed. 496; The Clarcoie, 27 Fed. 128; The Pequot, 30 Fed. 840; The Cement Rock, 38 Fed. 764. These and other cases that might be cited were cases of collision in harbors and channels of navigation, and in the vicinities of wharves, even more crowded with shipping than the narrow channel of Norfolk harbor, abreast of Town Point. And it so happened that, at the time of the collision under consideration, there was no vessel in the channel off Town Point to give the least embarrassment to either of the colliding vessels. If rule 19 is to govern in the present case, then the Luckenbach must be pronounced in fault. Having the Georgia on her starboard hand, it was her duty to keep out of the way. This was her duty irrespectively of any signal which she might receive from the Georgia. Rule 19 is arbitrary. It does not make it the duty of the controlling vessel to keep out of the way of the other, if she gets no embarrassing signal from that other. It is imperative and unconditional in terms, imposing an unqualified obligation. Whether the signal first given by the Georgia was the right one, or not, did not affect in the least degree the duty which the rule imposed upon the tug. Her duty was to keep out of the way of the Georgia, regardless of any other circumstance whatever. Nothing could relieve her from the obligation of this rule, and from responsibility for a collision, if it happened, except the single contingency of the Georgia failing to perform her correlative duty, imposed by rule 23, of "keeping on her course."

It follows from what has just been said that the Georgia, if rule 19 governs this case, had no right to give the signal of one whistle, and that the tug was under no obligation to comply with it when given. It did not in any degree affect the obligation of the tug to keep out of the Georgia's way, by whatever maneuver she might determine, in her own judgment, to make. It is therefore wholly immaterial whether the Georgia's first signal was a wharf signal, or a signal of navigation. It may have tended to confuse the pilot of the tug, but it could not excuse him. It may have been improper or injudicious, but, if the Georgia kept her course, it made no sort of change in the obligation of the tug to keep out of the Georgia's way. Nor was the mere fact of the tug's giving a cross signal necessarily a fault on the part of the tug. The tug had the right to give it and to attempt to cross the Georgia's bow, if, in her own judgment, she could thereby succeed in keeping out of the way of the Georgia. Rule 19 necessarily confers this sort of discretion upon the dominating vessel, but holds it responsible for the result, if the exercise of that discretion results in disaster.

I have no fault to find with the single whistle of the Georgia, nor the cross signal of the tug. The two vessels, when first in each

other's sight, were approaching a point where their respective courses crossed, at a speed of 240 to 300 yards a minute, or 12 to 15 feet a second. They were both under headway. Possibly, if both had instantly backed their engines, the collision could have been avoided, but this is doubtful. The tug took the risk, without instantly backing her engine, of an attempt to cross the Georgia's bow. She miscalculated chances, and the collision resulted, under circumstances under which rule 19 makes her responsible for the collision, the Georgia not having changed her own course. My opinion is that, when the two vessels first saw each other, they were approaching a common intersecting point at a speed which rendered a collision inevitable. This seems to have been the opinion of the navigating officers of the Georgia, whose stem was then only about 75 yards from the place of collision. I think it was already out of the power of the two boats, or either of them, to avoid a collision at the time they first saw each other, and that no fault is to be found with the signals of either, whatever they might have been. The fault was anterior to the time when they saw each other. The fault consisted in the tug's being under such headway in coming down the harbor at Town Point that she was unable to keep out of the Georgia's way. Whatever the speed might have been at which she was moving, it was so great that when, on turning Town Point, she found herself under the obligation of rule 19 in respect to the Georgia, she was hopelessly unable to comply with it. Clearly, a vessel has no right to steam along the wharves lining Norfolk Harbor, from the ferries to Town Point, at such speed that on turning that point she is unable to keep out of the way of a steamer coming up the harbor from the other direction. If rule 19 does not apply to the meetings of vessels in curved channels like this, it is of little use. It imposes upon vessels approaching such curvatures the duty of slacking speed, and placing themselves under complete self-control, by the time of arriving at the curvature. The rule may operate unfairly, as between vessels meeting each other near such curves; but it will operate so, only upon vessels which, mindful of its existence, fail to reduce themselves to such speed and control as, on arriving at curves, to be in condition to comply with the rule.

If rule 19 is to govern the case at bar, the Luckenbach was in fault, not so much in what she did after coming in sight of the Georgia, as before that vital moment, in being under such headway that she could not conform to rule 19; the Georgia's stem being then within 75 yards of the place of collision, and the tug being hardly more than 100 yards off; the two vessels being less than a minute of time from collision. But counsel for the tug contend that rule 19 does not apply in this case, and should not be enforced in cases of collision in crowded harbors and the vicinities of wharves; relying in this contention on the rulings of the courts in the cases of The Sunnyside, 91 U. S. 210, and The B. B. Saunders, 19 Fed. 118. The facts in the first of these two cases present no analogy to those of the case at bar, and it is cited only to show that the supreme court holds that rules of navigation are adopted to save life and property,

and that, consequently, they have exceptions, in which parties in fault are not allowed to invoke them in defense or excuse of plain errors in handling vessels. The case of The B. B. Saunders is cited to show that courts of admiralty will recognize instructions given by supervising inspectors to pilots, especially in their note to rules of navigation of which rule 19 is one, in which note they say: "The foregoing rules are to be complied with in all cases except when steamers are navigating in a crowded channel, or in the vicinity of wharves;—under such circumstances steamers must be run and managed with great caution, sounding the whistle as may be necessary, to guard against collision or other accidents." This note is a repetition, in other language, of rule 24, which provides that, in obeying all cardinal rules of navigation, "due regard must be had to all dangers and to any special circumstances which may exist in any particular case, rendering a departure from them necessary in order to avoid immediate danger." I do not see anything in these two ordinances which released the Luckenbach from the duty of keeping out of the way of the Georgia, or the Georgia from the duty of "keeping her course," on the occasion of the collision under consideration. The harbor, at the place where it occurred, was not crowded. Though it happened in the vicinity of wharves, there was no circumstance existing in connection with the wharves to affect in the least degree the duty under rule 19 of each vessel, in the emergency in which they found themselves,—no circumstance except the single one that the wharf made a considerable bend at that place, as already described. If that bend had suddenly occurred, just as the tug approached it, the case would have fallen under rule 24; for the event, being unforeseen, could not, in that case, have been provided for by either vessel. But the bend had been there for many years. It is shown by all the charts, and its existence was as well known to the navigator of the tug as any other physical feature of the harbor. Knowing of its existence, the tug ought to have approached the bend in such manner as not to have been under the necessity of appealing to rule 24 for protection against any consequences which might result from its manner of approaching it. So that the language of the court in the case of The Sunnyside applies to the tug, in reference to rule 24: "No party ought ever to be permitted to defend or excuse a plain error by invoking a general rule of navigation." I must decree against the tug.

NOTE. The decree entered in this case was affirmed by the circuit court of appeals upon an appeal taken by the owners of the tug. See 1 C. C. A. 489, 50 Fed. 129.