Engelbert J. BERGER, Special Administrator of the Estates of Victor Valdes et al., Libelants,

v.

BELGULF TANKERS, S. A.,
and
Arena Elmar, S. A.,
and
Panama Canal Company, Respondents.

PANAMA CANAL COMPANY,
Petitioner,

v.

Hermenegildo NAVARRO, Respondent-Impleaded.

Hermenegildo NAVARRO, Libelant,

v.

BELGULF TANKERS, S. A.,
and
Panama Canal Company, Respondents.

PANAMA CANAL COMPANY,
Petitioner,

v.

ARENA ELMAR, S. A., Respondent-Impleaded.

PANAMA CANAL COMPANY,
Libelant,

v.

Hermenegildo NAVARRO, Respondent.

Civ. Nos. 5630, 5631.

United States District Court
D. Canal Zone,
Balboa Division.

July 14, 1967.

E. J. Berger, Cristobal, Canal Zone, Charles Sovel, New York City, for libelants, libelant, respondent-impleaded & cross-respondent (Navarro).

David J. Markun, Jerry W. Mitchell, James B. Denman, S. C. Oldstrom, General Counsel Balboa Heights, Canal Zone, for respondents, petitioners, and cross-libelant (Panama Canal Co.)

Albert J. Joyce, Jr., Balboa, Canal Zone, Joseph C. Smith and Burlingham, Underwood, Barron, Wright & White, New York City, for Belgulf Tankers, S. A., respondent.

OPINION OF THE COURT

CROWE, District Judge.

This case involves two separate actions, Number 5630 and Number 5631, which

were consolidated for trial. Action Number 5630 is the result of a Libel in Personam brought by Engelbert J. Berger as Special Administrator for the Estates of Victor Valdes, Manuel Urrunaga, Manuel Albert Zapateiro, Francisco Espino, Hipolito Mosquera, Cirilio Melendez and Benjamin Batista against Belgulf Tankers, S.A., Arena Elmar, S.A., Panama Canal Company and Robert D. Valentine, Respondents. Action Number 5631 is the result of a Libel in Personam by Hermenegildo Navarro against Belgulf Tankers, S.A., Panama Canal Company and Robert D. Valentine.

In action Number 5630 the Panama Canal Company and Robert D. Valentine impleaded Hermenegildo Navarro as Respondent-Impleaded and in action Number 5631 the Panama Canal Company and Robert D. Valentine impleaded Arena Elmar, S.A. as Respondent-Impleaded, and the Panama Canal Company also cross-libeled Hermenegildo Navarro as Cross-Respondent.

As the result of the stipulation in the pretrial order that at all times material to these causes of action Captain Robert D. Valentine, the pilot, was acting within the scope of his employment and in the line of his duty as an employee of the Panama Canal Company and in view of the failure of the libelants to establish that any acts of Robert D. Valentine were committed with intent to injure the person or property of another, the libels were dismissed as to him.

In Admiralty 5630, the respondent, Arena Elmar, S.A., after having moved to quash service, which was denied and its exceptive allegations dismissed, failed to plead further. Counsel for respondent was permitted to withdraw and a default was entered against the respondent, Arena Elmar, S.A., on the question of liability with damages to be determined as the court may direct at a subsequent hearing.

These actions arose from the collision between the MV PAITILLA III and the SS BELGULF PROGRESS on the early morning of September 14, 1962 at approximately 0020 hours while the SS BELGULF PROGRESS was on a southbound transit of the Panama Canal. Shortly before and at the time of the collision the SS BELGULF PROGRESS was proceeding seaward along the Pacific Entrance Channel of the Panama Canal. The MV PAITILLA III was sighted on the starboard bow of the SS BELGULF PROGRESS approaching the channel from the southwest on a crossing course. She eventually entered the channel and came into collision with the SS BELGULF PROGRESS while in the Canal channel, east of the centerline and approximately due south of Buoy Number 4. As a result of the collision the MV PAITILLA III was cut in two and immediately thereafter sank with the loss of seven crew members and one passenger. The only person from the MV PAITILLA III surviving the collision was the Master, Captain Hermenegildo Navarro.

The actions were brought for personal injuries and wrongful death arising out of the collision.

## FINDINGS OF FACT

1. The SS BELGULF PROGRESS is a single screw steam turbine tanker, 556 feet 5 inches long, 71 feet 5 inches in beam of 12,018 gross tons, 6,934 net tons, and 6,500 horsepower which, at all times material hereto, was owned and operated by Defendant Belgulf Tankers, S.A., of Antwerp, Belgium, and was registered under the laws of Belgium. She was built in 1958 at Haverton, Hill-on-tees, England, by Furness Shipbuilding Company, Ltd. and had an authorized mean tropical fresh water draft of 31 feet 9¾ inches.

On September 14, 1962 her fresh water draft was 31 feet 04 inches forward and 31 feet 07 inches aft. She was fully loaded, but not over-loaded, with a cargo of gasoline and refined petroleum products and was bound on a voyage from Aruba, Dutch West Indies to Australia [Pre-Trial Order 2(b) (1) and (5)]. Her bridge was equipped with hydraulic and iron mike wheels, engine room telegraph, tachometer, wheel indicator, gyro and magnetic compasses, and

two whistles, one steam and the other electric. Her full ahead maneuvering speed was 80 rpms which gave her a theoretical speed of 13.2 knots, but her actual speed at full ahead maneuvering speed, as she was loaded on September 14, 1962, while proceeding along the Pacific Entrance Channel just prior to the collision was 9 to 10 knots.

Her master, Captain Jean Marie Votquenne, had been going to sea for 18 years and had served as Master for more than 3½ years prior to September 14, 1962.

2. At the time of the collision the MV PAITILLA III was a triple screw, diesel engine sand barge of 235 gross tons, 100 net tons, about 120 feet in overall length, 32 feet in beam and with a light draft of about 3 feet 6 inches in salt water. She was built in 1942 at Buffalo, New York by Bison Shipbuilding Company as U. S. Navy LCT–216. At all times material hereto she was owned and operated by Arena Elmar, S.A., of Panama, Republic of Panama, and was registered under the laws of Panama. Her master at the time of the collision on September 14, 1962 was Captain Hermenegildo Navarro Q. [Pre-Trial Order 2(b) 2 and 6].

On September 14, 1962 and continuing to the time of trial Captain Valentine was a fully qualified Panama Canal pilot [Pre-Trial Order 2(b) (4)]. He was well qualified professionally, having graduated from the New York State Maritime College, in 1943 as a licensed Third Mate. He sailed as a licensed deck officer from 1943 to 1950, served as an officer in the U. S. Coast Guard from 1950 to approximately 1954, returned to sea as a licensed deck officer until 1959 and then commenced employment as a Panama Canal Pilot. His time at sea sailing as a licensed deck officer included approximately four (4) years service as Master. He received his unlimited Panama Canal pilot's license in July 1960. On September 14, 1962 and continuing at the time of trial he held a valid unlimited Panama Canal pilot's license and a valid U. S. Coast Guard license as Master, Unlimited, All Oceans.

As of September 14, 1962 Captain Valentine had piloted vessels through the Pacific Entrance Channel in excess of 300 times and was thoroughly familiar with local conditions and customs.

4. The SS BELGULF PROGRESS was boarded by Panama Canal Pilot Captain Robert D. Valentine at approximately 1630 hours on September 13, 1962 while she lay at anchor in Limon Bay. She got underway for a southbound transit of the Canal shortly before 1700 hours. The transit proceeded smoothly, without any difficulties or problems.

She cleared the south end of Miraflores Locks at 2331 hours on September 13, 1962 and proceeded seaward along Balboa Reach, through Balboa Inner Harbor and along the Pacific Entrance Channel. Her engines were slowed at 2350 hours at Point 1 on Libelant's Exhibit No. 2 in Balboa Inner Harbor at which time she was making approximately 6 knots. Her speed was increased to full ahead maneuvering speed at 2357 hours in the vicinity of the Yacht Club (at Point 2 on Exhibit 2) at which time she was making approximately 5 or 6 knots.

At this time Captain Valentine, Panama Canal Pilot, Captain Jean Marie Votquenne, Master of the SS BELGULF PROGRESS, Jean Marie Materne, her Second Officer, and Van Proeyen, her helmsman, were on duty on her bridge with her First Officer de Potter de Ten Broeck and a lookout on duty on her bow.

5. The MV PAITILLA III departed from Paitilla Point without any cargo aboard at about 1400 hours on September 13, 1962 enroute to Punta Chame for a cargo of sand. She arrived at Punta Chame at about 1700 hours, immediately took aboard a full load of sand from the beach and departed Punta Chame about 2000 hours on the same date. Her draft with the load of sand then aboard was between five and six feet in salt water.

6. Captain Navarro was on the bridge of the MV PAITILLA III as she departed

from Punta Chame and remained there for about one hour after departure in accordance with his custom. He then went to sleep, leaving orders that he be called when she passed Tortola Island, approximately 40 minutes before she would reach and cross the Pacific Entrance Channel. The MV PAITILLA III proceeded on her course for Paitilla Point at approximately 5 miles per hour. Captain Navarro was not called prior to the time the MV PAITILLA III reached the Pacific Entrance Channel but awakened himself shortly before the collision. Libelant Victor Valdes was the deck officer in charge of the watch and he was also acting as lookout. The helmsman on duty and steering the vessel at the time of the accident was Libelant Francisco Espino, and the engineer on watch was Libelant Cirilio Melendez. Melendez was located on the starboard side of the main deck (one deck below the wheelhouse), just forward of the wheelhouse.

7. The night of September 13–14, 1962 was dark with good visibility. At the time of the collision the tide was flooding, being about midway between low and high water.

8. Prior to and at the time of the collision all navigation running lights required by the pertinent applicable regulations to be shown by the SS BELGULF PROGRESS were properly located and were burning brightly.

9. After ringing full ahead maneuvering speed at 2357 hours on September 13, 1962 the SS BELGULF PROGRESS continued seaward along the Pacific Entrance Channel in a routine manner with all necessary and required members of her crew at their duty stations and with Panama Canal Pilot Captain Robert D. Valentine at the conn. She was proceeding seaward, favoring her own starboard (the west) side of the channel.

10. As the SS BELGULF PROGRESS reached a point in the channel parallel with the Mine Dock and about a mile and a half from the place where the collision occurred (designated as point "A" as shown on Libelant's Ex-

hibit 2 which is Chart No. H. O. 5006 published by the Navy Hydrographic Office depicting the Pacific Coast "Approaches To Panama Canal"), Captain Valentine and her master sighted a vessel on her starboard bow in an apparently crossing course. At this time the SS BELGULF PROGRESS was making 8½ to 9 knots. The vessel, which was later identified as the MV PAITILLA III, was located close to two miles away (at Point A–1 on the Exhibit 2) when first sighted. Captain Valentine and the other officers on the bridge of the SS BELGULF PROGRESS observed the MV PAITILLA III continuously from the time of sighting her until the collision. Shortly after sighting her they determined that she was on a collision course with their vessel. She appeared to be headed so as to cross the Canal channel at a speed of about 6 knots.

11. When the SS BELGULF PROGRESS reached a point in the channel about seven tenths of a mile from where the MV PAITILLA III was first sighted (designated as Point B on Exhibit 2), Captain Valentine sounded the danger signal, five or more short blasts of the whistle in rapid succession. The MV PAITILLA III had continued on her course and was nearing the channel at the same rate of speed as before.

Section 7.72 of the Rules and Regulations Governing Navigation of the Panama Canal and Adjacent Waters (35 CFR 4.272) provides for the use of this signal "whenever a power-driven vessel or motorboat which, under these provisions, is to keep her course and speed, is in sight of another vessel and is in doubt whether sufficient action is being taken by the other vessel to avert collision." Captain Valentine used the signal correctly in this case to advise the MV PAITILLA III that he did not understand her intentions.

12. The MV PAITILLA III gave no apparent response to this signal. She did not sound her whistle to indicate a port or starboard turn nor did she sound her whistle to indicate that her engines were going astern. To Captain Valen-

tine and the officers on the bridge of the SS BELGULF PROGRESS, the MV PAITILLA III appearing to be maintaining her course and speed.

13. A minute or two after sounding the danger signal, Captain Valentine put the engines of the SS BELGULF PROGRESS on slow ahead. She was then making 9½–10 knots. This is the usual place where a vessel is slowed down to disembark the pilot. At this time the MV PAITILLA III appeared to be continuing on her crossing course.

14. About two minutes after putting the engines of the SS BELGULF PROGRESS on slow ahead, Captain Valentine blew a second danger signal. A period of approximately 5 minutes had elapsed since the blowing of the first danger signal during which time the MV PAITILLA III continued on a collision course without any apparent change in her course or speed.

15. Very shortly thereafter, Captain Valentine ordered port, 10 degrees rudder, then hard port rudder and within a few seconds, full astern, double ring emergency power, on her engines. Captain Valentine sounded a two blast signal on the whistle at the same time he gave the rudder orders. Less than one minute later, at approximately 0020 hours on September 14, 1962, the collision occurred within the prism lines of the Pacific Entrance Channel in Canal Zone waters due south of Buoy 4 and east of Buoy 3.

16. As a result of the collision the MV PAITILLA III was cut in two and immediately thereafter sank with the loss of the lives of seven crew members and one passenger. The only person from the MV PAITILLA III surviving the collision was her Master, Libelant Captain Hermenegildo Navarro.

17. Following the collision the SS BELGULF PROGRESS was immediately put on slow ahead, Captain Valentine ordered the Panama Canal launch DARTER, which was standing by to take him off the vessel, to search for survivors and he then maneuvered the SS BELGULF PROGRESS to the anchorage where she anchored at 0032½ hours.

18. The whistle signals, rudder movements and engine maneuvers given by Captain Valentine were proper and timely and were promptly executed by the SS BELGULF PROGRESS.

19. Under the applicable Rules of the Road, Section 7.63 of the Rules and Regulations Governing Navigation of the Panama Canal and Adjacent Waters (35 CFR 4.263), the SS BELGULF PROGRESS was the privileged or holding-on vessel and the MV PAITILLA III was the burdened or giving-way vessel throughout the entire period of time from when the SS BELGULF PROGRESS sighted the MV PAITILLA III until the collision.

20. The MV PAITILLA III, the giving-way vessel in this collision, could have avoided the collision by her actions alone at any position and time up to somewhere just before entering the channel.

21. Captain Navarro knew that his vessel, the MV PAITILLA III, was prohibited from crossing the channel ahead of the SS BELGULF PROGRESS under the circumstances of the crossing situation existing just prior to the collision.

22. There is a customary practice followed by small vessels in the vicinity of the seaward end of the Pacific Entrance Channel. This practice is that the small vessels frequently approach the channel, holding their course and speed until they reach the edge of the channel or on occasion even to the point of entering the channel before they (the small vessels) change course and/or speed to avoid crossing ahead of a vessel approaching along the axis of the Canal. Prior to the collision, the MV PAITILLA III had followed this practice many times.

23. Captain Valentine was aware of and familiar with this local custom and practice and properly took it into consideration when deciding on his course of action in conning the SS BELGULF PROGRESS just prior to the collision.

24. Captain Navarro was not familiar with the Rules of the Road applicable in the area where the collision occurred and did not know the meaning of the various whistle signals provided for in the Rules of the Road.

25. The MV PAITILLA III did not have a proper lookout on duty.

26. Neither the officer-in-charge of the bridge watch on the MV PAITILLA III nor any other man on duty at the time of the collision could change her course.

27. Neither the officer-in-charge of the bridge watch on the MV PAITILLA III nor any other man on duty at the time of the collision was qualified to navigate her across the channel.

28. The officer-in-charge of the bridge watch on the MV PAITILLA III was apparently asleep.

29. The compass of the MV PAITILLA III was not functioning properly at the time of the collision nor was her whistle in an operative condition.

30. The navigation lights of the MV PAITILLA III were not proper for a vessel of her size.

31. The MV PAITILLA III violated Sections 7.63, 7.67 and 7.68 of the Rules and Regulations Governing Navigation of the Panama Canal and Adjacent Waters (35 CFR 4.263, 4.267 and 4.268 respectively).

32. The many faults of the MV PAITILLA III, her Master and crew fully account for and explain the cause of the collision.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and the subject matter of this consolidated action.

2. Navigation of the waters wherein this collision occurred is governed by Chapter 7 of the Rules and Regulations Governing Navigation of the Panama Canal and Adjacent Waters (35 CFR 4.201 through 4.283 and 4.303).

3. The flagrant faults of the MV PAITILLA III in the following respects fully explain the cause of, and account for, the collision:

a. She failed to keep clear of the Canal channel until the privileged vessel had passed; she attempted to cross ahead of the SS BELGULF PROGRESS; and she did not slacken her speed or stop or reverse; all as required by Sections 7.63, 7.67 and 7.68, respectively, of the Rules and Regulations Governing Navigation of the Panama Canal and Adjacent Waters (35 CFR 4.263, 4.266 and 4.268, respectively).

b. Her Master was not familiar with the Rules of the Road and did not know the meaning of the various whistle signals provided for in the Rules of the Road.

c. She did not have nor keep a proper lookout.

d. No one in her bridge watch on duty at the time of the collision could change her course.

e. No one in her bridge watch on duty at the time of the collision was qualified to navigate her across the Canal channel.

f. The officer-in-charge of her bridge watch was probably asleep.

g. Her deck watch was incompetent and inattentive to their duties.

h. Her whistle and compass were inoperative.

i. Her navigation lights were not proper for a vessel of her size.

4. The SS BELGULF PROGRESS properly kept her course and speed as required by section 7.66 of the Rules and Regulations Governing Navigation of the Panama Canal and Adjacent Waters (35 CFR 4.266) up to the time when departure from her course and speed became necessary in attempting to avert the impending collision. The whistle signals, rudder movements and engine maneuvers executed by Captain Valentine were proper and timely and in full accordance with the provisions of sections 7.66, 7.83 and 7.103 of the Rules and Regulations Governing Navigation of the Panama Canal and Adjacent Waters (35 CFR 4.266, 4.283 and 4.303,

respectively). United States v. S. S. Soya Atlantic, 4 Cir., 330 F.2d 732 (1964); Compania de Navigacion Cebaco, S. A. v. The Steel Flyer, 4 Cir., 200 F.2d 643; The Knoxville City, 9 Cir., 112 F.2d 223.

5. There was no fault on the part of the SS BELGULF PROGRESS nor of Captain Valentine nor of anyone else on board the SS BELGULF PROGRESS which contributed in any manner whatsoever to the collision.

6. The libel in each of the consolidated cases is dismissed as against the Respondents Panama Canal Company and Belgulf Tankers, S. A. and Respondents shall recover of the Libelants costs allowable under the laws of the United States and of the Canal Zone.