**AFRAN TRANSPORT COMPANY, as Owner of the STEAMSHIP CABIMAS, Plaintiff,**

v.

**The STEAMSHIP TRANSCOLORADO, Hudson Waterways Corporation, and Panama Canal Company, Defendants.**

Civ. No. 6705.

District Court, Canal Zone, Division Balboa.

Jan. 28, 1971.

Burlingham, Underwood, Wright, White & Lord, New York City, and De Castro & Robles, Balboa, Canal Zone (Joseph C. Smith, New York City, and David de C. Robles, Balboa, Canal Zone, of counsel), for plaintiff.

Burke & Parsons, New York City, and Roy Phillipps, Balboa, Canal Zone, (Max Taylor and Raymond J. Burke, New York City, of counsel) for defendants, TRANSCOLORADO and Hudson Waterways Corp.

Dwight A. McKabney and John L. Haines, Jr., Balboa Heights, Canal Zone, for defendant, Panama Canal Co.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CROWE, District Judge.

The following statement of the case is taken from the Pretrial Order and is an agreed statement of the admitted facts that are material:

This action arises from a collision between the S/T CABIMAS and the S/S TRANSCOLORADO that occurred on November 10, 1968 at approximately 0755 hours while the CABIMAS was commencing a southbound transit of the Panama Canal. At the time of the collision, the CABIMAS was in Cristobal Harbor south of the breakwater entrance and northwest of the Cristobal mole beacon proceeding southward toward Gatun Locks within and along the channel of the Panama Canal. A vessel later determined to be the TRANSCOLORADO was sighted maneuvering in Colon Harbor to the eastward of the Canal channel. The TRANSCOLORADO entered the channel and she and the CABIMAS came into collision at a point within the Canal channel. As a result of the collision, both vessels sustained damage. There were no personal injuries to anyone aboard either vessel.

Captains Robert F. Rourke and Roger H. Swain were the Panama Canal pilots assigned to and aboard the CABIMAS. They were so assigned pursuant to 35 CFR 105.1 and were employees of defendant, Panama Canal Company. At all times material to this action Captain Rourke was in charge of the navigation and movement of the CABIMAS.

At all times material hereto the CABIMAS was owned by Afran Transport Company, a Liberian corporation having its principal place of business in Naples, Italy. The TRANSCOLORADO was owned by Hudson Waterways Corporation, a New York Corporation, having its principal place of business in New York, New York. The Panama Canal Company was, and still is, a wholly-owned corporate agency of the Government of the United States, incorporated by the Panama Canal Company Act of

June 29, 1948 (c. 706, sec. 2, 62 Stat. 1076), as amended by Act of September 26, 1950 (c. 1049, secs. 5 et seq., 64 Stat. 1041). The incorporation statute now is contained in Title 2, Canal Zone Code, sections 61–75 and 121–123, 76A Stat. 8–15. The Panama Canal Company was, and still is, authorized by statute to maintain and operate the Panama Canal and its approaches, including the area in which the said collision occurred, and to maintain and operate facilities and appurtenances necessary and appropriate for the accomplishment of the purposes of the corporate charter and to take such action as is necessary and appropriately to carry out the powers specifically conferred upon it. 2 C.Z.C. § 66(a) (1), (4) and (7), 76A Stat. 11. The Panama Canal Company is expressly authorized to sue and be sued in its own name. 2 C.Z.C. § 65(a) (3), 76A Stat. 11. The liability of the Panama Canal Company in this cause, if any be found, is governed by the provisions of 2 C.Z.C. §§ 292, 293, 76A Stat. 23.

The CABIMAS is a single, right-turning screw, steam turbine tanker of 21,-874.89 gross tons and 13,567.86 net tons, 665.6 feet in overall length, and 87 feet in beam. She is of Liberian registry, was built in 1955 at Hamburg, Germany, by Deutsche Werft, and at the time of the collision had an authorized mean tropical salt water draft of 36 feet, 6⅜ inches. On that date, November 10, 1968, her actual salt water draft was 27 feet, 3 inches fore and aft. She was laden with a cargo of crude oil and was bound from Puerto Miranda, Venezuela, to La Pampilla, Peru, with Captain Antonino D'Arrigo as her master.

The TRANSCOLORADO is a single, right-turning screw, steam turbine cargo vessel of 10,014.56 gross tons and 6,-206.23 net tons, 522.8 feet in overall length, and 71.7 feet in beam. She is U. S. registry, was built in 1945 at Richmond, California, by Kaiser Corporation, and was converted to a heavy lift carrier in 1968 at Newport News, Virginia, by the Newport News Shipbuilding Company. She had an authorized mean tropical salt water draft of 33 feet, ¼ inch. On November 10, 1968 her actual salt water draft was 18 feet, 6 inches forward and 25 feet, 6 inches aft. She was in ballast, bound from San Francisco, California to Baltimore, Maryland, with Gaudenzio J. Carcich as her master.

The collision between the CABIMAS and the TRANSCOLORADO occurred within the prism lines of the channel of the Panama Canal, northwest of the Cristobal mole beacon, at approximately 0755 hours on November 10, 1968.

## FINDINGS OF FACT

1. Captain D'Arrigo obtained his master's license in 1954 and had sailed as master for about six years prior to November 10, 1968. The CABIMAS is equipped with bridge engine revolution indicators in the wheelhouse and on the bridge wings and all were functioning properly on the morning of November 10, 1968. Her half ahead maneuvering speed was 45–50 rpm's, which gave her a theoretical speed of about 7–7½ knots, but her actual speed at half ahead maneuvering speed as she was loaded on November 10, 1968, while proceeding along the Atlantic Entrance Channel of the Panama Canal prior to collision, was less than five knots.

2. Captain Rourke was employed by the Panama Canal Company in 1961 as a pilot in training and thereafter, in the normal course, earned his unlimited Panama Canal pilot's license, which he held on November 10, 1968. Captain Rourke graduated from New York State Maritime Academy in 1948 at the age of 19 and sailed for Moore-McCormack lines continuously from that time until he came to work for the Panama Canal Company, with the exception of two nine-month periods during which he attended Saint Lawrence University. On November 10, 1968, Captain Rourke also held, and still holds, an off-shore unlimited master's license. Prior to November 10, 1968, Captain Rourke had piloted

vessels of many and various types through the Panama Canal, including supertankers of over 100 foot beam, and he was thoroughly familiar with the rules governing the navigation of vessels in Canal Zone waters.

3. On November 10, 1968, the CABIMAS' anchor was hove up at 0740 and Captain Rourke got the vessel underway for a southbound transit of the Canal. He ordered her engines slow ahead at 0741. The CABIMAS had been assigned southbound transit number "eight". She was flying both the pilot flag and numeral pennant required by sections 103.40 and 103.41, title 35, Code of Federal Regulations. Captain Rourke observed that there were no other vessels in the main ship channel in the area of the CABIMAS. He ordered the engines put half ahead at 0744 and brought the CABIMAS into the channel, and steadied her up on the axis thereof.

4. The portion of the main ship channel of the Panama Canal lying between the Cristobal breakwater and the Cristobal mole beacon is 500 feet wide. The speed limit prescribed for vessels proceeding along the Canal channel in that area is 12 knots. 35 CFR 111.162.

5. Both Captain Rourke and Captain D'Arrigo, master of the CABIMAS, noticed the TRANSCOLORADO maneuvering in Colon Harbor as the CABIMAS entered the Canal channel. Captain Rourke was advised by Marine Traffic Control radio that she had no pilot aboard her and that she was not proceeding to dock in Cristobal. Captain Rourke informed Captain D'Arrigo that the TRANSCOLORADO was obligated to wait for the CABIMAS, which was proceeding south along the Canal channel.

6. The CABIMAS proceeded at an engine speed of half ahead down the channel. Both Captains Rourke and D'Arrigo kept the maneuvering TRANSCOLORADO under observation. When the TRANSCOLORADO's maneuvers brought her near the east prism line of the channel, Captain Rourke maintained the CABIMAS' course and speed. Captain Rourke observed that the quartermaster maintained a steady course along the axis of the channel. The vessel's engine, which had been ordered half ahead at 0744, four minutes after the anchor was aweigh, remained on half ahead until about three minutes before the collision at approximately 0755.

7. The TRANSCOLORADO had anchored in Colon Harbor to take bunkers in the early morning of November 10, 1968. She completed those bunkering operations at 0630 hours and prepared to get underway. Her master, Gaudenzio J. Carcich, arrived on the bridge shortly after 0700 and ordered the engines put on standby at 0712. Also on the TRANSCOLORADO's bridge, as that vessel made ready to get underway, were second mate Cyrus W. Kitchens and an able-bodied seaman. Mr. Kitchens was assigned to duty standing by the vessel's telegraph to relay orders to the engine room; the able-bodied seaman was at the wheel. No one on that watch aboard the TRANSCOLORADO had been assigned to duty as lookout.

8. Before the anchor was hove the TRANSCOLORADO was lying in a southeasterly direction, with her stern facing approximately toward the Canal channel. Prior to getting his vessel underway, Captain Carcich surveyed the harbor area and observed the CABIMAS near the Atlantic breakwaters proceeding on a southerly course. Neither he nor anyone else aboard the TRANSCOLORADO noticed the CABIMAS again until the collision was imminent. The TRANSCOLORADO was equipped with large kingposts which obstructed the view forward of persons standing in her wheelhouse.

9. At 0732 the TRANSCOLORADO's anchor was ordered hove. At 0741 her engines were ordered half astern. At 0744 the TRANSCOLORADO's engines were ordered stopped and half ahead. Captain Carcich ordered hard right rudder to twist the TRANSCOLORADO through Colon Harbor. He stationed

himself on the port wing of the vessel's bridge.

10. The TRANSCOLORADO continued to maneuver about in Colon Harbor until 0751 when her right swing brought her into proximity with the Canal channel. At this time, Captain Carcich glanced back to starboard and saw the CABIMAS still heading south, steaming toward him down the Canal channel. He ordered his vessel's engines full astern and the helm amidships.

11. When the TRANSCOLORADO suddenly entered the Canal channel, blowing her whistle and cutting across the bow of the CABIMAS, the vessels were so close that collision could not be avoided by the actions of the burdened TRANSCOLORADO alone. Captain Rourke then ordered the CABIMAS' engines stopped and put full astern. He ordered three short blasts sounded on the whistle and the anchor let go. In response to these orders, the CABIMAS' engines were promptly put full astern, three short blasts on the whistle were promptly sounded, and the port anchor was promptly let go.

12. Shortly thereafter, Captain Rourke ordered the CABIMAS' engines put on emergency full astern. Both Captains Rourke and D'Arrigo noted prior to the collision that the CABIMAS' engines had built up to between 60 and 65 revolutions per minute astern. The port anchor was held with 4–5½ shots in the water.

13. Until the time her port anchor was dropped, the CABIMAS was proceeding generally along the axis of the channel. As her anchor was dropped and held, her bow turned to port and her stern to starboard.

14. No anchor was dropped by the TRANSCOLORADO and that vessel's bow penetrated to at least within 50 feet of the axis line of the channel.

15. The starboard bow of the CABIMAS and the starboard side of the TRANSCOLORADO came into collision at approximately 0755 hours on November 10, 1968, within the prism lines of the main ship channel of the Panama Canal, northwest of the Cristobal mole beacon. Both vessels sustained damage as a result of the collision.

16. The TRANSCOLORADO did not keep a proper lookout.

17. The TRANSCOLORADO did not keep clear of the CABIMAS.

18. Captain Rourke, approximately a month before the collision involved herein, had returned to his duties as a pilot after being suspended for thirty days because he had taken a ship up to the Basin and asked to be relieved because he "had a couple of drinks with the Captain going up the channel * * * and didn't want to handle the ship when [he] had been drinking." On November 20, ten days after this incident, he was involved in another accident, and on November 25 he left the employ of defendant Panama Canal Company.

19. TRANSCOLORADO came to anchor at 0130 on Sunday, November 10, and a fuel barge came alongside at 0150. Bunkering began at 0300 and completed at 0630, following which the master was called to the bridge, the engines were put on standby at 0712, the bunker hose disconnected at 0720, and those aboard started heaving the anchor at 0732, and at 0741 the anchor was aweigh.

20. While TRANSCOLORADO was at anchor she was heading in a southeasterly direction, and at 0741 the engines were put at half astern, with 10° left rudder on the wheel, and were kept that way until 0744 when the engines were stopped and put a half ahead and the wheel hard right in order to twist the vessel "in as short a turn as possible" to head her in a northerly direction to proceed toward the Caribbean. At or before the time the engines were ordered at half ahead, the master observed the vessel which later proved to be the CABIMAS either stopped in the water or moving very slowly and, because of the angle of sighting, he could not determine whether the vessel was in the anchorage or in the channel.

21. TRANSCOLORADO continued on this steady course at half ahead and hard right wheel for 7 minutes until 0751. At that time her master observed that the CABIMAS was picking up speed, whereupon, at 0751, 4 minutes before collision, he ordered the engines full astern and blew three blasts on the whistle, indicating the backing movement, and put the wheel amidships. The CABIMAS continued on course and at 0754 the master of the TRANSCOLORADO called the engine room by phone for all possible astern revolutions and again blew the three blast backing signal and the danger signal. At about the same time the CABIMAS, when about 600 feet from the point of collision, blew three blasts and let go her port anchor. TRANSCOLORADO entered the channel on the northwesterly heading with her stem approximately 200 feet from the easterly side of the channel and the CABIMAS veered sharply to her left and brought her starboard side near the bow into collision with the starboard side of the TRANSCOLORADO just about 125 feet from the bow, between her No. 2 and No. 3 hatches. The bow of the CABIMAS at the time of collision was about 125 feet from the easterly side of the channel and she was still making headway of about 1½ or 2 knots and the TRANSCOLORADO was about dead in the water.

22. At all material times there was on watch on the bridge of the TRANSCOLORADO the master, the second mate, the wheelsman, and, after about 0750, the third mate, who had come to relieve the second mate, while on the bow there was the chief officer, chief electrician and the boatswain.

23. The collision took place in broad daylight, clear weather, good visibility, and negligible current which did not affect the navigation of either vessel.

24. The CABIMAS had been at anchor since the night of November 9 in the anchorage south of the breakwater west of the channel, and after being boarded by two Canal pilots at 0720 she began heaving her anchor at 0731 (one minute before TRANSCOLORADO) and her anchor was up at 0740 (one minute before TRANSCOLORADO). Her heading at anchor, as indicated by her course recorder (Plaintiff's exhibit 6), was about 200°. Pilot Rourke had previously observed the TRANSCOLORADO at anchor in Colon Harbor. At 0741 (0736 engine bell book time) the engines were put at slow ahead (at the same time TRANSCOLORADO went half astern) and seconds thereafter the master of the CABIMAS observed the TRANSCOLORADO finishing with her anchor and maneuvering in the anchorage and called this condition to the attention of the pilot. Pilot Rourke responded with, " * * * don't worry about him" and put the engines ahead at 0744. The master was sufficiently concerned about TRANSCOLORADO's maneuver to make the following entry in the log book: "At 0744 observed the S. S. TRANSCOLORADO coming from our port side crossing our course."

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties and the subject matter of this action.

2. Navigation of the waters wherein this collision occurred is governed by the Canal Zone regulations appearing in part 111 of title 35, Code of Federal Regulations, entitled "Rules for the Prevention of Collisions." The said regulations have the force and effect of law.

3. The argument of counsel for the defendant-counterclaimant is persuasive that the last clear chance gave opportunity to Pilot Rourke to veer to starboard as there was ample space. However, we are determining here if he was negligent in pursuing the course he chose in exercising his expertise in following the rules of piloting in the Panama Canal. The Board of Local Inspectors, composed of an experienced U. S. Navy captain, as chairman, and two qualified and experi-

enced Panama Canal pilots, found that there was fault on the part of the captain of the S. S. TRANSCOLORADO, the defendant-counterclaimant in this case, and that there was no fault on the part of the pilot, or the master or crew, of the plaintiff's vessel, the S. T. CABIMAS.

■ The hearing was held at 1350 of the day of the accident, when everything was fresh in the minds of the witnesses, and under apparently relaxed circumstances. It was a question of pilotage using Panama Canal rules. The best judges of these questions are those who apply the rules and know the problems that confront pilots in charge of large ships of wood and steel floating on Canal waters. The men composing the Board of Local Inspectors are employees of the defendant, Panama Canal Company, or its alter ego, the Canal Zone Government, but they have no direct financial interest in the outcome and are probably as free from pressures that could sway them in their decisions as members of any similar board. As a consequence, the decision of the Board is entitled to great weight and the "Monday morning quarterbacking" of skilled counsel for defendant-counterclaimant cannot be sustained against the Board's finding without better evidence than was presented. It must have appeared to Pilot Rourke that to stop the ship was the best move he could make. If the TRANSCOLORADO continued across his bow a turn to the starboard must have appeared to him to ensure collision. His decision at the moment of last clear chance was to stop the vessel rather than to continue ahead and attempt to turn. It might easily be said that the stopping maneuver was the best, after all, as the damage to the vessels was slight, and to have maintained sufficient speed to have made a successful veer to the right may have precipitated a far more serious collision. Pilot Rourke did not know what the TRANSCOLORADO had in mind, and the moment of decision presented itself suddenly and unexpectedly.

■ 4. The faults of the TRANSCOLORADO fully account for the collision, (The City of New York, 147 U.S. 72, 75, 85, 13 S.Ct. 211, 37 L.Ed. 84).

(a) She failed to keep a proper lookout.

(b) She failed to keep clear of CABIMAS, a vessel on the axis of the Canal channel, as required by 35 C.F.R. 111.-145(d). (Berger v. Belgulf Tankers, S. A., D.C., 270 F.Supp. 813, 818–819; affirmed, per curiam 5 Cir., 396 F.2d 453).

5. The CABIMAS properly kept her course and speed as required by the Rules for the Prevention of Collisions (35 C.F.R. 111.147) up to the time that the actions of TRANSCOLORADO alone could not avoid the collision, (Wilson v. Pacific Steamship Co., 276 U.S. 454, 461, 48 S.Ct. 369, 72 L.Ed. 651; The Emma Kate Ross, 3 Cir., 41 F. 826, 828; The Delaware, 161 U.S. 459, 469, 16 S.Ct. 516, 40 L.Ed. 771).

6. There was no fault on the part of the CABIMAS her Panama Canal pilot, Rourke, nor anyone else on board the CABIMAS, which contributed in any manner whatsoever to the collision.

7. The TRANSCOLORADO and defendant Hudson Waterways Corporation are solely at fault for the collision.

8. The counterclaim of defendant Hudson Waterways Corporation is dismissed as to CABIMAS, plaintiff Afran Transport Company, and Panama Canal Company, and an interlocutory decree entered in behalf of plaintiff for the resultant damages, with interest, costs and disbursements.